IN THE

# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2023

ARGUED: JANUARY 10, 2024
DECIDED: MAY 15, 2024

No. 21-2554

CHAMMA K. BRANDON,

*Plaintiff-Appellant,*

*v.*

MARK ROYCE, DEPUTY SUPERINTENDENT OF SECURITY, LESLIE MALIN, DEPUTY
SUPERINTENDENT OF PROGRAMS, JOHN V. WERLAU, SAFETY AND SECURITY
LIEUTENANT, IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES,

*Defendants-Appellees.*\*

————

Appeal from the United States District Court
for the Southern District of New York.
16-cv-5552 – Briccetti, *District Judge.*

————

---

\* The Clerk of Court is respectfully directed to amend the caption accordingly.

Before: CALABRESI AND NATHAN, *Circuit Judges*; NAGALA, *District Judge*.***

————

Plaintiff-Appellant Chamma K. Brandon appeals from the United States District Court for the Southern District of New York's (Briccetti, *J.*): (1) grant of summary judgment to the Defendants-Appellees on his claim that they violated his right to the free exercise of religion under the First Amendment of the United States Constitution; and (2) the district court's denial of his request to reopen discovery for a second time to permit expert testimony on his claim that one defendant, Mark Royce, subjected him to cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. We agree with Plaintiff-Appellant that the district court erred in granting summary judgment to the Defendants-Appellees on his First Amendment claim, but we find no error in the district court's denial of his motion to reopen discovery. We therefore VACATE IN PART and AFFIRM IN PART.

————————————

ALESSANDRA DEBLASIO, Pro Bono Counsel, New York, N.Y., for

Plaintiff-Appellant.

DENNIS FAN, Senior Assistant Solicitor General, State of New York

(Barbara D. Underwood, Solicitor General, State of New York, Ester

Murdukhayeva, Deputy Solicitor General, State of New York, *on the*

---

** Judge Sarala V. Nagala, of the United States District Court for the District of Connecticut, sitting by designation.

*brief*), for Letitia James, Attorney General, State of New York, New York, N.Y.

_____

CALABRESI, *Circuit Judge*:

Chamma K. Brandon ("Brandon"), then proceeding *pro se* as an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and incarcerated at Sing Sing Correctional Facility ("Sing Sing"), brought suit under 42 U.S.C. § 1983 in the United States District Court for the Southern District of New York (Briccetti, *J.*) against three prison officials in their individual and official capacities. As relevant here, Brandon alleged that: (1) all three defendants — Mark Royce ("Royce"), then Deputy Superintendent of Security at Sing Sing, Leslie Malin ("Malin"), then Deputy Superintendent of Program Services at Sing Sing, and John V. Werlau ("Werlau"), then Safety and Security Lieutenant at Sing Sing — violated his right to the free exercise of religion under the First Amendment of the United States Constitution by denying him a special meal in celebration of Eid al-Adha; and (2) Royce violated his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution by ordering that his housing block be constantly illuminated.

The district court granted the defendants' motion for summary judgment on Brandon's First Amendment claim and denied Brandon's request to reopen discovery for a second time to permit expert testimony at trial on his Eighth

Amendment claim. Following a five-day trial in September 2021, a jury found that Royce had not violated Brandon's Eighth Amendment right to be free from cruel and unusual punishment.

On appeal, Brandon argues that the district court erred by granting summary judgment to the defendants on his First Amendment claim and by denying his request to reopen discovery to permit expert testimony on his Eighth Amendment claim. We hold that the district court erred in granting the defendants' motion for summary judgment but that the district court did not abuse its discretion in denying Brandon's request to reopen discovery for a second time.

Accordingly, we VACATE IN PART and AFFIRM IN PART.

## BACKGROUND

### I. First Amendment Claim

Eid al-Adha, or the feast of sacrifice, is a major annual Islamic holiday observed worldwide through special prayer service, shared meals, and other religious activities. *See Brandon v. Royce*, No. 16–cv–5552, 2019 WL 1227804, at *1 (S.D.N.Y. Mar. 15, 2019). Brandon alleged that Eid al-Adha is a four-day religious celebration whose first day in 2015 fell on Thursday, September 24. *Id.*

According to a memorandum from Imam Jon Young, Sing Sing's "Coordinating Chaplain," to Defendant Malin, Sing Sing organized a full-day event on September 24, 2015 to celebrate Eid al-Adha. Supp. App'x 95. That event included a religiously mandated morning shower, a prayer service, fellowship activities, and a shared religious meal "prepared by Muslim cooks" and served to Muslim inmates in the mess hall after "the population feed-up." *Id.* Importantly,

4

Imam Young's memorandum further specified that meal trays "shall be provided" for Muslim inmates in "Keep-lock, [the housing units], or the Hospital" who were unable to join their fellow observers in the mess hall. *Id.* "A list of [those] confined Muslim inmates [was] attached." *Id.* The parties agreed that Brandon was able to attend the September 24 event in person and that he received the Eid al-Adha meals that day. *Brandon*, 2019 WL 1227804, at *2.

Sing Sing also scheduled a separate event for September 26, 2015 at which a special meal like that offered on September 24 would be served in the mess hall to Muslim inmates and their guests. Brandon's First Amendment claim arises from a single incident related to that second event. The parties dispute many of the material facts. Therefore, we briefly recount the material facts from each party's perspective.

## A. Brandon's Version of Events

According to Brandon, and as corroborated by the sworn declaration of Jerry Johnson ("Johnson"), an inmate then serving as the Administrative Chaplain Clerk, the September 26 event was organized to commemorate Eid al-Adha through a shared religious meal with inmates and their invited guests. App'x 113 ¶¶ 11–14 (Brandon Declaration), 133 ¶¶ 11–14 (Johnson Declaration). The day before the event, Imam Young informed the Muslim inmates that the defendants had realized the September 26 event was overbooked. App'x 112 ¶ 4, 132 ¶ 4. 136 inmates had signed up to attend, approximately eleven more than the maximum number of inmates who could participate. *See* Supp. App'x 71; Compl. Ex. A, ECF No. 3. Imam Young "relayed" that, "after reasoning with [the defendants in the instant case], it was decided that if some of the inmates were willing to voluntarily

withdraw from attending [the September 26 event], all of the invited guest[s] would be able to attend." App'x 112 ¶ 5, 132 ¶ 5.

Imam Young further "assured" that, as part of the arrangement approved by the defendants, Muslim inmates who voluntarily withdrew from the September 26 event would receive, "in commemoration of the Eid Celebration," the special meal in their cells on meal trays. App'x 112 ¶ 6, 132 ¶ 6. Brandon withdrew from attending the September 26 event on the condition that he receive the special meal through a meal tray sent to his cell. App'x 112–13 ¶¶ 8, 13.

As with the September 24 event, a list of inmates entitled to the meal trays was generated. A chart labeled "Prayer Service Religious [Meal] Trays" listed twenty-four inmates who were to receive the special meal in their cells. App'x 121. The list purported to be from "IMAAM J. YOUNG [sic]," was addressed to the mess hall supervisor, and was dated September 25, 2015. *Id.* Brandon was included on the list. *Id.* But the provenance of that list is unknown. *Brandon*, 2019 WL 1227804, at *3.

Pursuant to the agreement reportedly approved by the defendants, Brandon did not attend the September 26 event. But he did not receive a meal tray in his cell. Another inmate, John McClellan ("McClellan") declared that, around noon, Imam Young directed him and other inmate helpers to prepare the meal trays for delivery to the inmates on the list described above. App'x 143 ¶ 1. Imam Young departed after giving that instruction. *Id.* ¶ 2. Shortly thereafter, Defendant Werlau arrived. *See id.*; *id.* at 113–14 ¶¶ 13–14, 133–34 ¶ 15. After he inquired about the purpose of the trays, McClellan and "several other inmates" explained

6

why they were being prepared and their significance. *Id.* at 143 ¶ 2. But Werlau ordered that the trays be discarded. *See id.; id*. at 113–14 ¶¶ 13–14, 134 ¶ 15.

## B.     The Defendants' Version of Events

According to the defendants, the September 26 event — unlike the September 24 event — was "not a religious event" and was "not necessarily related to [Eid al-Adha]." *Brandon*, 2019 WL 1227804, at *2. Rather, it was a "family event" open to Muslim inmates and their guests. *Id.*

A "Special Events Package" was prepared by John Mahoney, DOCCS's Recreation Program Leader II, for the September 26 event. Compl. Ex. B, at 23. One page of the package dated "9/23/2015" lists the "CATEGORY OF PROGRAM" as "RELIGIOUS," "IMAM YOUNG" as the member of the "SPECIAL EVENT PLANNING COMMITTEE" responsible for the "PROGRAM," and "A. BULLOCK" as the individual responsible for the food service. *Id.* A different page of the package dated "September 04, 2015" provides the menu for the September 26 event and lists the names and housing locations of the inmates who were "assigned cooks." *Id.* at 24. That menu page also contains a handwritten notation signed by Defendant Royce, stating: "No Facility Prepared food will leave the Event Area. Any Extra food will be Disposed of at the end of the Event [sic]." *Id.* In a declaration, Royce averred that he "instructed someone to write the

statement . . . for safety and security reasons" and signed it on September 8, 2015.[1] Supp. App'x 121–22 ¶¶ 3, 5.

The defendants deny approving or instructing Imam Young to offer to have meal trays sent to the inmates' cells in exchange for those inmates withdrawing from the September 26 event. Supp. App'x 122 ¶ 6 (Royce Declaration), 127 ¶ 18 (Malin Declaration); *see id.* at 131–33 ¶¶ 6–17 (Werlau Declaration). They further aver that they were not aware of any list providing for Muslim inmates to receive the special meal in their cells or of any member of the executive team who approved such a list. Supp App'x 123 ¶¶ 7–8, 127 ¶¶ 15–17, 131 ¶¶ 7–11.

As support for their position, the defendants submitted a sworn declaration from Imam Young, who is not a party to this lawsuit. In his declaration, Imam Young denied asking any Muslim inmates to withdraw voluntarily from the September 26 event in exchange for receiving the special meal in their cells. Supp. App'x 137 ¶ 22. He also averred that he informed Muslim inmates "after Friday prayers for at least eight weeks prior to the event and during Ramadan that there would be no [meal trays]" on September 26 and that he "informed [Brandon] on at least one occasion that he was not entitled to a [meal] tray on September 26, 2015." Supp. App'x 136–37 ¶¶ 17, 28. Imam Young also denied generating a list

---

[1] The version of the special events package appended to Brandon's complaint is labeled "UPDATED 9/24/15." Compl. Ex. B, at 21. Brandon argues that Royce "updated" the menu page with the handwritten notation on or around September 24, 2015, "seemingly contradict[ing] the initial order that would have given [Brandon] the [meal] tray." *Brandon v. Royce*, No. 16–cv–5552, 2017 WL 2656452, at *5 (S.D.N.Y. June 20, 2017); *see* Oral Arg. at 24:22–25:12; Pl.'s Mem. of Law in Resp. to Defs.' Mot. for Summ. J. 23, ECF No. 71.

of inmates who were to receive the special meal in their cells on September 26 and instructing any inmate to prepare such meal trays. Supp. App'x 137 ¶¶ 25–27.

On September 26, 2015, Werlau ordered the inmates who were preparing the meal trays to discard them. Werlau averred in his sworn declaration that he had reviewed the special events package for the event and that it "did not contain any provision for any food to be taken out of the [mess hall] and transported to the housing blocks." Supp. App'x 131 ¶¶ 5–6. Rather, the special events package "specifically provided" that "[n]o facility prepared food will leave the event area" and that "[a]ny extra food will be disposed of at the end of the event." Supp. App'x 131 ¶ 8 (first alteration in original). Werlau further declared that he "spoke to . . . Mark Royce by telephone and he verified that no food should be allowed to leave the [mess hall]." Supp. App'x 131 ¶ 9. Werlau then "ordered that th[e] extra food be disposed of in accordance with the written documentation and . . . Royce's verbal confirmation." Supp. App'x 132 ¶ 12.

As a result, Brandon did not receive the special meal on September 26, 2015.

## II.    Eighth Amendment Claim

Approximately two months after Eid al-Adha, on or about November 23, 2015, new light bulbs were installed in housing block B, where Brandon was then housed. *Brandon*, 2019 WL 1227804, at *4. But according to Brandon, maintenance workers mistakenly installed 1000-watt, wide-range, high-intensity, "stadium-styled light bulbs." *Id.*

On November 28, 2015, Brandon filed a grievance about the newly installed light bulbs, which he claims Royce ordered to be left on for twenty-four hours per day, seven days per week. Brandon explained that, because of the constant

illumination, he was "beginning to develop migraine headaches, dizziness, and excessive fatigue," among other symptoms. Supp. App'x 109. He requested that the lights "be either turned off or dimmed" so he could sleep. *Id.* Royce responded in a memorandum dated December 11, 2015 that Brandon's complaint was "being investigated and followed up by the facility Maintenance Department." *Id.* at 108.

The parties agree that on or about December 21, 2015 the 1000-watt light bulbs were replaced, but Brandon alleged that the replacement bulbs were "similar in intensity." *Brandon*, 2019 WL 1227804, at *4. Brandon alleged that he was unable to shield himself from the constant illumination, resulting in "a host of medical ailments, namely: sleep deprivation; insomnia; severe migraines; reoccurring episodes of dizziness; hallucinations, and severe psychological trauma." *Id.* Brandon filed further appeals with DOCCS's central office challenging the continuous lighting, but his complaints were rejected. DOCCS explained that "the upper tier lights are kept on 24 hours a day 7 days a week for security reasons," that "the wrong bulbs were used[,] and that they have since been replaced." *Id.* at *5.

## III. Proceedings Below

Proceeding *pro se* and under 42 U.S.C. § 1983, Brandon filed a complaint against the defendants on July 12, 2016 in the Southern District of New York. As relevant here, Brandon alleged that the defendants, by denying him a meal tray on September 26, deprived him of his right to the free exercise of religion under the First Amendment of the United States Constitution as incorporated against the States by the Fourteenth Amendment of the United States Constitution, *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). He further alleged that Royce

10

violated his right to be free from cruel and unusual punishment pursuant to the Eighth Amendment of the United States Constitution as incorporated against the States by the Fourteenth Amendment, *see Robinson v. California*, 370 U.S. 660, 666 (1962), by ordering the constant illumination of his housing block.[2]

The defendants moved for summary judgment, arguing that Brandon had failed to state a valid claim under either the First Amendment or the Eighth Amendment. With respect to Brandon's free exercise claim, the defendants further argued that they had legitimate penological interests that, as a matter of law, justified the denial of the meal tray on September 26. Defs.' Mem. of Law in Supp. of Defs.' Mot. for Summ. J. 6, 14, 21, ECF No. 65; *see* Defs.' Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J. 1, ECF No. 77.

## 1.

The district court agreed with this latter argument and held that the defendants were "entitled to summary judgment on [Brandon's] free exercise claim" because they had "a legitimate penological interest in preventing food from being transported to the housing blocks," namely:

> (i) the concern that inmates could secret[e] contraband in
>
> the food, which cannot be searched before it leaves the

---

[2] Brandon also alleged that all three defendants deprived him of his "statutory right to religious exercise" under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* App'x 30. The district court dismissed that claim. *Brandon*, 2017 WL 2656452, at *5. Brandon separately alleged that Royce violated his Eighth Amendment right to be free from cruel and unusual punishment by acting with "deliberate[] indifferen[ce] to his health and safety" by ordering the installation of the light bulbs in November 2015. *Brandon*, 2019 WL 1227804, at *7. The district court held that claim failed as a matter of law. *Id.* Brandon does not challenge either holding on appeal.

> mess hall; (ii) the ability to use [meal] trays to influence other inmates through bartering, selling, extortion, and bribery; (iii) the risk of theft; (iv) the health risks involved if inmates choose to eat the food after holding it in their cells for days; and (v) hygienic reasons, including maintaining cleanliness and preventing rodents.

*Brandon*, 2019 WL 1227804, at *6–*7.

The district court additionally ruled that the defendants were entitled to summary judgment as a matter of law because Brandon "had an alternative means of exercising his right—by attending the September 26 event and receiving the very meal of which he was deprived." *Id.* at *7.

**2.**

The district court, however, denied the government's motion for summary judgment on Brandon's Eighth Amendment claim. *Id.* at *9. Brandon then successfully moved for the appointment of *pro bono* trial counsel to represent him. Brandon's trial counsel entered a notice of appearance in September 2019 and sought to reopen discovery to depose Defendant Royce. The district court granted that motion and subsequently scheduled trial on Brandon's Eighth Amendment claim for June 15, 2020. The trial was delayed, however, due to the onset of the COVID-19 pandemic.

In August 2020, six months after taking Royce's deposition, trial counsel disclosed for the first time his intention to call an expert witness, Dr. Steven Lockley, to testify on "the effects of constant illumination on health." App'x 171, 184–86. Trial counsel moved to reopen discovery again to facilitate the expert

testimony. *Id.* at 198. Royce objected both to the expert testimony and to the motion to reopen discovery. *Id.* at 171, 187–89. At a pretrial conference, the district court tentatively scheduled trial for February 1, 2021 and precluded the proposed expert witness.

The trial ultimately took place over a five-day period in September 2021. The jury found that Brandon did not establish that Royce violated his right to be free from cruel and unusual punishment under the Eighth Amendment. This appeal followed.

## DISCUSSION

### I.     First Amendment

We review a district court's grant of summary judgment *de novo*. *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021). "Summary judgment is appropriate only where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023) (citation omitted). "We may consider only the evidence before the district court." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006). "In determining whether there are genuine disputes of material fact, we are 'required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" *Union Mut. Fire Ins. Co.*, 64 F.4th at 445 (citation omitted).

We will affirm summary judgment where the record, taken as a whole, could not lead a rational factfinder to enter judgment for the non-moving party. *Id.* "The moving party bears the initial burden of showing why it is entitled to

summary judgment." *Salahuddin*, 467 F.3d at 272. "If the movant makes this showing . . . , the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Id.* at 273. On appeal, Brandon contends that the grounds articulated by the district court were insufficient to support summary judgment in favor of the defendants on his First Amendment claim. We agree.

Inmates do not abandon their constitutional rights at the prison gate. *Id.* at 274. "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348 (1987) (internal citation omitted). To show a violation of his First Amendment right to free exercise "[i]n the context of a [Section] 1983 claim . . . , there is no requirement to show that the governmental burden on religious beliefs was 'substantial.'" *Kravitz v. Purcell*, 87 F.4th 111, 127 (2d Cir. 2023). "Rather, 'a plaintiff may carry the burden of proving a free exercise violation . . . by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Id.* (alteration in original) (citation omitted).

"Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, [however,] are the interests of prison officials charged with complex duties arising from administration of the penal system." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (alteration in original) (quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)). Accordingly, "prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged

infringements of fundamental constitutional rights." *O'Lone*, 482 U.S. at 349. The same analysis applies to an individual decision to deny a prisoner the ability to engage in some requested religious practice. *Ford*, 352 F.3d at 595 n.15.

"Courts must evaluate four factors in making the reasonableness determination: whether the challenged . . . official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Salahuddin*, 467 F.3d at 274 (footnote omitted).

In granting summary judgment to the defendants, the district court did not resolve the parties' dispute as to whether the September 26 event was a religious event related to Eid al-Adha or an unrelated "family event." Rather, the district court relied on the defendants' asserted penological interests and their view that there was an alternative means of Brandon exercising his First Amendment right: by attending the September 26 event and receiving the special meal there. Neither ground supports granting judgment as a matter of law to the defendants at the summary judgment stage.

Whether Brandon had an alternative means of receiving the September 26 meal is a disputed material fact. According to Brandon — and as corroborated by Johnson, *see* Fed. R. Civ. P. 56.1(c), the deal purportedly approved by the defendants was that inmates who volunteered to withdraw from attending the September 26 event would receive, in exchange, the special meal in their cells through meal trays. App'x 112 ¶¶ 4–6 (Brandon Declaration); App'x 132 ¶¶ 4–6

(Johnson Declaration). The defendants respond that they never authorized the purported meal-tray arrangement and that Brandon could have received the meal by attending the September 26 event. In support of that view, they point to a declaration from Imam Young denying Brandon's version of events.

But, as the party against whom summary judgment was sought, Brandon is entitled to the resolution of this ambiguity in his favor. *See Union Mut. Fire Ins. Co.*, 64 F.4th at 445. Under Brandon's version of events, he voluntarily withdrew from the September 26 event under the belief (misguided, as it turned out) that he would receive a meal tray. Resolving the factual ambiguities in Brandon's favor, we cannot say that Brandon had genuine alternative means of receiving his religious meal, given his voluntary withdrawal from the event. And no one disputes that, after withdrawing from the event, Brandon had no other way of receiving the meal. The district court thus erred by crediting the defendants' view that Brandon had an alternative means of exercising his right to the free exercise of religion.

The defendants argue that they are nonetheless entitled to summary judgment because the record, "at most," suggests that Imam Young acted without express or implied authority in proposing the meal-tray arrangement for September 26, resulting in "an unfortunate misunderstanding" between Imam Young and Brandon that "is not of constitutional dimensions." Appellees' Br. 30. But, as explained, Brandon's and Johnson's declarations aver that the meal-tray arrangement was expressly approved by the named defendants. Reading the record in the light most favorable to Brandon, those declarations are entitled to the benefit of the doubt.

The district court also erred in holding that the defendants were entitled to summary judgment based on penological concerns. As counsel for defendants acknowledged at Oral Argument, those concerns — that inmates could secrete contraband in the food, which could not be searched prior to leaving the mess hall, or use food to extort, bribe, or otherwise influence other inmates, the risk of theft, and the health and hygienic risks — arise whenever meal trays are delivered to inmates' cells. Oral Arg. at 09:45–09:52. Nevertheless, the defendants authorized the use of meal trays for the September 24 Eid al-Adha event held two days before Brandon was denied his meal tray. In district court, the defendants made no attempt to explain why they overlooked those concerns on September 24 but could not overlook them on September 26.

On appeal, the defendants attempt for the first time to distinguish the two events by arguing that their decision to deny Brandon a meal tray on September 26 was "based on security concerns attendant to events *open to the public*." Appellees' Br. 28 (emphasis added). That is, for the September 26 event, they had a legitimate penological concern that "a visitor would introduce contraband into the prison." *Id.* at 28–29 (citation omitted). Given that the September 24 Eid al-Adha event was open only to inmates, they add, they lacked any similar concerns when authorizing the use of meal trays for that event. *See id.* The defendants argue that the evidence reviewed by the district court supports this argument, pointing to a declaration from Defendant Royce identifying "a security concern that someone (civilian or inmate cooks) might place contraband in the food and transport it to the housing unit . . . ." Supp. App'x 122–23 ¶ 6.

17

Royce's declaration most plausibly states a concern that cooks might place contraband in the meal trays. Although Royce first refers generally to a "serious concern about the security risk[] . . . that contraband could be secreted in the food," Royce specifies in the next paragraph that the particular security concern relates to "civilian or inmate cooks." *Id.* at 122–23 ¶¶ 5–6.

And there is nothing in the record to suggest that "civilian cooks" were involved with the September 26 event. The special events package prepared and used by the defendants lists the names and housing locations of the inmates who were "assigned cooks" for the September 26 event. Supp. App'x 72. That is consistent with the procedure defendants say was used for the September 24 Eid al-Adha meal, which was "prepared by Muslim [inmate] cooks" and sent to other inmates who could not join their fellow observers in the mess hall. Supp. App'x 95; *see* Appellees' Br. 28–29. If inmates — and only inmates — prepared both meals, Royce's declaration is not enough to explain why the defendants authorized meal trays on September 24 but not September 26.

The defendants urge a broader reading of Royce's declaration, asserting in conclusory fashion that it expresses a general "'security concern' that a 'civilian . . . might place contraband in the food.'" Appellees' Br. 29 (quoting Supp. App'x 122–23 ¶ 6). But defendants' quotation elides Royce's express reference to "civilian or inmate *cooks*." Supp. App'x 122–23 ¶ 6 (emphasis added). And the defendants do not point to — nor have we found — anything else in the record to support that reading. There is nothing in the record to suggest, for example, that civilian visitors would have had access to the meal trays. The defendants' papers in support of their motion for summary judgment do not mention any risks that

"civilian" visitors might have posed. Indeed, the district court understood the defendants' concern to be "that *inmates* could secret[e] contraband in the food." *Brandon*, 2019 WL 1227804, at *7 (emphasis added).

To be sure, we do not dispute that an increased possibility that a visitor would introduce contraband into a prison is a legitimate penological concern, *see Smith v. Coughlin*, 748 F.2d 783, 788 (2d Cir. 1984), or that prison officials may have legitimate reasons to permit meal trays on some occasions and prohibit them on others. We simply conclude that there is no unambiguous record support for the defendants' claim that they denied Brandon a meal tray on September 26 because "the presence of outside guests increased the risk that contraband could be hidden in the food." *See Salahuddin*, 467 F.3d at 276–77 ("Post hoc justifications with no record support will not suffice" to show that "the disputed official conduct was motivated by a legitimate penological interest."). And we further conclude, based on the evidence before the district court, that the penological concerns relied on by the district court and raised on appeal cannot at this juncture support summary judgment in favor of the defendants. *See also id.* at 277 ("We would not be surprised if such evidence were forthcoming at trial . . . , but it is absent from the record as presently developed.").

The defendants argue, in the alternative, that they are entitled to qualified immunity on Brandon's First Amendment challenge because this court has held that "the denial of a religious meal violates a clearly established right . . . [only] absent a legitimate penological justification." Appellees' Br. 32 (quotation marks and citation omitted). But since — at this stage — we have concluded that the only penological justifications asserted lack unambiguous support in the present

record, we cannot grant qualified immunity on that ground. *See, e.g., Ford*, 352 F.3d at 597 (finding that "prior cases make it sufficiently clear that absent a legitimate penological justification, . . . prison officials' conduct in denying [a plaintiff] a feast imbued with religious import was unlawful"). And the defendants do not offer any other basis on which we might grant them qualified immunity on this claim.

## II.    Preclusion of Brandon's Expert Witness

We turn now to Brandon's challenge to the preclusion of Dr. Steven Lockley, his expert witness. At the pretrial conference, trial counsel for Brandon explained that he sought to reopen discovery to offer testimony about the "effects of lighting on health" and to "object[]" to the defense witnesses' expected testimony about the positioning of the lights. App'x 201. Trial counsel further explained that he had not made that request sooner because, when he first joined the case in September 2019, he "understood" that the parties were "pushing to get a trial as soon as possible, and [he] wanted to make as narrow as possible the remaining issues to resolve before trial." App'x 200.

In denying the request to reopen discovery, the district court ruled that Brandon's trial counsel had not established that Brandon was entitled to the relief requested, as the "need for this discovery was certainly foreseeable" when counsel joined the case in September 2019 as "[t]he case has always been about the lighting and the intensity of lighting and how close it was and everything else." App'x 205. The district court further ruled that Royce "would suffer prejudice by having to incur additional time and expense to deal with this issue." App'x 204.

The district court assigned little to no weight to: (1) the fact that trial was not imminent, App'x 199, 204; and (2) whether the expert testimony was "important enough to allow [Brandon] to reopen discovery," App'x 206. As to the latter, the district court suggested that "most regular people, i.e. jurors, can understand intuitively that if you have a bright light illuminating your cell 24 hours a day, that's a bad thing and it's going to result in sleeping difficulties and associated problems arising from that." App'x 205. Finding nonetheless that the importance of the proposed testimony was "a closer call," the district court precluded it because the prejudice to Royce, the foreseeability of the need for the proposed testimony, and trial counsel's lack of diligence in seeking to reopen discovery sooner all weighed against Brandon. App'x 206.

"The district court has wide discretion in punishing failure to conform to the rules of discovery." *Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir. 1988). Accordingly, we review the district court's preclusion order for abuse of discretion. *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 212 (2d Cir. 2009). "In determining whether a district court has exceeded its discretion, we consider the following factors: (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Id.* at 213 (citation omitted).

On appeal, Brandon — represented by different counsel — contends that the district court abused its discretion because each of the four factors weighs in his favor. We disagree. Even assuming, favorably to Brandon, that he is correct

as to second and fourth factors (the importance of Dr. Lockley's testimony and the possibility of a continuance), the district court assigned little to no weight to those factors, and Brandon does not offer a persuasive reason why they should carry more weight on appeal.

As to the first factor, Brandon did not offer a "good explanation" for failing to comply with discovery. App'x 204. Brandon's Eighth Amendment claim "always" hinged on the details of the lighting in housing block B and how Brandon's exposure to that constant illumination impacted his health. *Id.* at 205. But trial counsel did not offer a persuasive reason for waiting *nearly a year* to request an expert witness on the very issue at the heart of the claim.

Brandon argues that the delay of trial following the COVID-19 pandemic supports his request to reopen discovery a second time, as there was more "time to prepare an expert report[] [and] to conduct a deposition." Appellant's Br. 33 (quoting App'x 200–02). But that argument only further undermines the explanation offered by trial counsel in support of his second request to reopen discovery. If trial counsel understood that a 144-day period between his request for expert testimony and trial on February 1, 2021 would not prevent the parties from "pushing to get to trial as soon as possible," why not request expert testimony in October 2019 when the original trial date (June 15, 2020) was still more than 200 days away?

Brandon responds that the need for expert testimony only became apparent after review of "the information learned at Defendant Royce's February 27 deposition[,] which included light-fixture distances that conflicted with . . . Brandon's account." Appellant's Br. 32. Even assuming that such

information only became apparent after Royce's deposition *and* that Dr. Lockley's testimony on "the effects of constant illumination on health" was relevant to the "light-fixture distances" in housing block B, Brandon makes no attempt to explain the long delay between Royce's deposition and his request to reopen discovery.

Turning to the third factor, Brandon does not dispute that reopening discovery to allow new testimony would be prejudicial to Royce, but he asserts that any such prejudice should be discounted because it would be "de minimis." Appellant's Br. 36–39. As support, Brandon cites our decision in *Outley*, but, as that opinion notes, the testimony at issue there "was not the technical or specialized evidence given by an expert witness[.]" 837 F.2d at 591. Rather, the plaintiff sought to introduce the lay testimony of two eyewitnesses. *Id.* The court determined in that case that meeting the new testimony would have required the opposing party to suffer only the "inconvenience" of "a brief interview" and background check. *Id.*

Here, however, the precluded testimony was expert testimony. As Royce argued in district court, dealing with the new testimony would have required him "to investigate the expert's qualifications, depose the expert witness, and retain his own rebuttal expert." App'x 188. Moreover, at the time that Brandon requested the expert testimony, the case was "trial ready," *id.*, and Dr. Lockley's testimony bore on the crux of Brandon's claim. "Because [Royce might well] have been forced, at a very late date in the discovery process, to accommodate potentially significant shifts in the theories being offered against [him], this factor cuts in [his] favor." *Softel, Inc. v. Dragon Med. & Sci. Commun., Inc.*, 118 F.3d 955, 962 (2d Cir. 1997).

Given the "wide discretion" the district court has in punishing failure to conform to the rules of discovery and the two factors weighing heavily against Brandon, *Outley*, 837 F.2d at 590, we cannot say that the district court abused its discretion in precluding Brandon's expert witness.

## CONCLUSION

For the foregoing reasons, we **VACATE** the district court's grant of summary judgment to the defendants on Brandon's First Amendment free exercise claim, and we otherwise **AFFIRM** the judgment of the district court.