15-690 -cv(L)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2023

(Argued:  December 12, 2023      Decided:  November 13, 2024)

Docket No. 15-690-cv(L), 23-614(CON), 23-700(CON)

———————————————

DEBORAH D. PETERSON, ET AL.,
*Plaintiffs-Appellees,*

v.

BANK MARKAZI, AKA CENTRAL BANK OF IRAN, AND CLEARSTREAM BANKING, S.A.,
*Defendants-Appellants,*

BANCA UBAE SPA, JPMORGAN CHASE BANK, N.A., AND ISLAMIC REPUBLIC OF IRAN,
*Defendants.*

———————————————

Before:      SACK, PARKER, AND LOHIER, *Circuit Judges*.

This case, which is now before us for a third time, involves the Plaintiffs' efforts to enforce multi-billion-dollar judgments that they hold against the Islamic Republic of Iran based on Iran's involvement in the 1983 bombing of the U.S. Marine barracks in Beirut, Lebanon. In this action, they seek turnover to them of the contents of an account with Clearstream Banking, a Luxembourg-based financial institution: a $1.68 billion right to payment representing the principal and interest of bond investments that Clearstream made in New York on behalf of Bank Markazi, Iran's central bank. The United States District Court

for the Southern District of New York (Loretta A. Preska, *Judge*), relying in part on 22 U.S.C. § 8772—which makes certain assets available to satisfy the Plaintiffs' judgments against Iran—granted summary judgment in favor of the Plaintiffs and issued an order directing Clearstream and Bank Markazi to turn the contents of the Luxembourg account over to the Plaintiffs in New York. Clearstream and Bank Markazi appealed.

For the reasons set forth below, we conclude that (1) the district court lacks subject matter jurisdiction over the Plaintiffs' turnover claim against Bank Markazi; (2) the district court may exercise personal jurisdiction over Clearstream; (3) Clearstream's challenge to the constitutionality of 22 U.S.C. § 8772 fails; and (4) the district court nonetheless erred in granting summary judgment in favor of the Plaintiffs. We therefore AFFIRM in part and VACATE in part the district court's order and judgment and REMAND for further proceedings consistent with this opinion.

Judge Lohier concurs in a separate opinion.

> JAMES P. BONNER, Fleischman Bonner &
> Rocco LLP, White Plains, New York
> (Patrick L. Rocco, Susan M. Davies,
> Fleischman Bonner & Rocco LLP, White
> Plains, New York, Liviu Vogel, Salon
> Marrow Dyckman, Newman & Broudy

LLC, New York, New York, *on the brief*), *for Plaintiffs-Appellees*;

ROBERT K. KRY, MoloLamken LLP, Washington, D.C. (Lauren M. Weinstein, MoloLamken LLP, Washington, D.C., Elizabeth K. Clarke, MoloLamken LLP, Chicago, Illinois, *on the brief*), *for Defendant-Appellant Bank Markazi.*

BENJAMIN KAMINETZKY (Craig T. Cagney, Corey M. Meyer, *on the brief*), Davis Polk & Wardwell LLP, New York, New York, *for Defendant-Appellant Clearstream Banking, S.A.*

SACK, *Circuit Judge*:

This case, which is now before us for a third time, involves the Plaintiffs' efforts to enforce multi-billion-dollar judgments that they hold against the Islamic Republic of Iran based on Iran's involvement in the 1983 bombing of the U.S. Marine barracks in Beirut, Lebanon. In this action, they seek turnover to them of the contents of an account with Clearstream Banking, a Luxembourg-based financial institution: a $1.68 billion right to payment representing the principal and interest of bond investments that Clearstream made in New York on behalf of Bank Markazi, Iran's central bank. The United States District Court for the Southern District of New York (Loretta A. Preska, *Judge*), relying in part on 22 U.S.C. § 8772—which makes certain assets available to satisfy the Plaintiffs'

3

judgments against Iran—granted summary judgment in favor of the Plaintiffs and issued an order directing Clearstream and Bank Markazi to turn the contents of the Luxembourg account over to the Plaintiffs in New York. Clearstream and Bank Markazi appealed.

For the reasons that follow, we conclude that (1) the district court lacks subject matter jurisdiction over the Plaintiffs' turnover claim against Bank Markazi; (2) the district court may exercise personal jurisdiction over Clearstream; (3) Clearstream's challenge to the constitutionality of 22 U.S.C. § 8772 fails; and (4) the district court erred in granting summary judgment in favor of the Plaintiffs when it declined to apply state law to determine the ownership of the assets sought by the Plaintiffs. We therefore AFFIRM in part and VACATE in part the district court's order and judgment and REMAND for further proceedings consistent with this opinion.

**BACKGROUND**

This is the third time that this case has come before this Court. Because the factual background has been discussed at length in our earlier opinions, we recite only the facts relevant to the instant appeal.

*Factual Background*

The Plaintiffs-appellees are a group of American service members injured in the 1983 bombing of the U.S. Marine barracks in Beirut, representatives of 241 service members who were killed in the attack, and family members of those who were injured or killed. The Plaintiffs were previously awarded judgments in the United States District Court for the District of Columbia totaling more than $8 billion in compensatory and punitive damages against the Islamic Republic of Iran under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1605(a)(7) (repealed in 2008); 1605A; *see also* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083(a), 122 Stat. 3, 338 (2008) (moving the state-sponsored terrorism exception to the FSIA from 28 U.S.C. § 1605(a)(7) to 28 U.S.C. § 1605A).

From 1994 until 2008, Defendant Bank Markazi—the Central Bank of Iran—held U.S.-dollar denominated bonds (the "Markazi bonds") in an account

with Defendant Clearstream, a Luxembourg-based financial institution.

Clearstream serves as a securities intermediary for its customers, meaning that it holds securities on behalf of and for the benefit of its clients. In total, it holds assets amounting to approximately €14 trillion and processes some 170 million securities transactions every year. The prospectuses for the Markazi bonds, which provide detailed information about the bond offerings, required Clearstream as custodian to accept payment of interest and redemption proceeds from the bonds into a New York-based bank account. For more than 25 years, Clearstream has maintained such an account at Defendant JPMorgan Chase Bank, N.A. ("JPMorgan") in New York ("the New York Account"), which it uses to send and receive approximately $7–9 billion every day in bond-related payments on behalf of many clients—including, at the relevant times, Bank Markazi.

In 2007, Clearstream notified Bank Markazi that the United States Office of Foreign Asset Control ("OFAC"), an enforcement arm of the U.S. Department of the Treasury, was pressuring Clearstream to terminate its business with Bank Markazi. In early 2008, Bank Markazi opened accounts with Defendant Banca UBAE ("UBAE"), an Italian bank, while UBAE opened an account with

Clearstream ("Account 13061"). Clearstream then transferred Bank Markazi's bond interests to Account 13061. Several months later, after learning of allegations by OFAC that UBAE held the account for the purpose of obscuring Bank Markazi as the true owner of the assets, Clearstream froze the account.[1]

Because Clearstream continued to receive interest and principal payments in New York on the Markazi bonds, it opened a new "sundry blocked account" ("Account 13675") in Luxembourg to collect and hold any further right to payment that would ordinarily have flowed to the frozen account, Account 13061. Neither UBAE nor Bank Markazi may access the funds in Account 13675. Between July 2008 and October 2012, Clearstream received a total of $1.68 billion—spread across 62 interest and principal payments originating from the Markazi bonds—into the New York Account. Each time Clearstream received such a payment in New York, it credited Account 13675 in Luxembourg with a right to payment for the same dollar amount. Thus, at all relevant times, the right to payment accruing in Account 13675 directly reflected the cash payments

---

[1] According to OFAC, in the context of international sanctions programs, the terms "block" and "freeze" can be used interchangeably to refer to the imposition of "an across-the-board prohibition against transfers or dealings of any kind with regard to the property." Office of Foreign Asset Control, Basic Information on OFAC and Sanctions, https://ofac.treasury.gov/faqs/topic/1501 (last visited Nov. 12, 2024).

Clearstream had received into the New York Account for its bond investments associated with Bank Markazi. The total right to payment in the blocked Account 13675 in Luxembourg eventually grew to $1.68 billion ("the Assets").

*Procedural History*

After registering their judgments against Iran in the Southern District of New York, the Plaintiffs initiated this action against Clearstream, Bank Markazi, UBAE, JPMorgan, and the Islamic Republic of Iran. The Plaintiffs sought, among other things, an order requiring turnover to them of a total of approximately $1.6 billion held by Clearstream in the New York Account to satisfy partially the judgments they hold. The district court determined that there were no assets traceable to Bank Markazi in the New York Account and that the property sought by the Plaintiffs was the right to payment located in Luxembourg. *See Peterson v. Islamic Republic of Iran*, No. 13-CV-9195, 2015 WL 731221, at *10 (S.D.N.Y. Feb. 20, 2015) ("[A]ny assets in which Bank Markazi has an interest, and which are at issue in this action, are in Luxembourg."). As those assets were located abroad, the district court determined that it lacked subject matter jurisdiction to order their turnover because the FSIA, 28 U.S.C. § 1609, "does not allow for attachment of property outside of the United States." *Id*.

8

On appeal, this Court affirmed the district court's decision regarding the identity and location of the relevant assets. *See Peterson v. Islamic Republic of Iran* (*Peterson II*), 876 F.3d 63, 86 (2d Cir. 2017) ("[T]he asset the plaintiffs seek—a right to payment—is located in Luxembourg."), *vacated on other grounds*, 140 S. Ct. 813 (2020) (mem.). We vacated the judgment of the district court with respect to subject matter jurisdiction, however, concluding that the "FSIA does not by its terms provide execution immunity to a foreign sovereign's extraterritorial assets," and would therefore "be no impediment to an order . . . directing Clearstream—should the court have personal jurisdiction over it—to bring the Markazi-owned asset held in Luxembourg to New York State." *Id*. at 90–91. Clearstream and Bank Markazi petitioned the United States Supreme Court for certiorari.

While the petitions for certiorari were pending, Congress amended 22 U.S.C § 8772 through the National Defense Authorization Act for Fiscal Year 2020 ("NDAA 2020"), Pub. L. No. 116-92, 133 Stat. 1198 (2019). As amended, 22 U.S.C. § 8772 ("Section 8772") reads, in relevant part:

> Interests in certain financial assets of Iran
> (a) Interests in blocked assets
> (1) In general

Subject to paragraph (2), notwithstanding any other provision of law, including any provision of law relating to sovereign immunity, and preempting any inconsistent provision of State law, a financial asset that is —

(A) held by or for a foreign securities intermediary doing business in the United States;

(B) a blocked asset (whether or not subsequently unblocked), or an asset that would be blocked if the asset were located in the United States, that is [identified and the subject of the proceedings in *Peterson et al. v. Islamic Republic of Iran et al.*, Case No. 10 Civ. 4518, or *Peterson et al. v. Islamic Republic of Iran et al.*, Case No. 13 Civ. 9195 (LAP), the case before us on appeal[2]]; and

(C) equal in value to a financial asset of Iran, including an asset of the central bank or monetary authority of the Government of Iran or any agency or instrumentality of that Government, that such foreign securities intermediary or a related intermediary holds abroad,

shall be subject to execution or attachment in aid of execution, or to an order directing that the asset be brought to the State in which the court is located and subsequently to execution or attachment in aid of execution, in order to satisfy any judgment to the extent of any compensatory damages awarded against Iran for damages for personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, or hostage-taking, or the provision of material support or resources for such an act, without regard to concerns relating to international comity.

---

[2] Clearstream also maintained a correspondent account at Citibank to handle transactions related to the bonds. The proceeds deposited in that account were the subject of a separate turnover action in *Peterson v. Islamic Republic of Iran* ("*Peterson I*"), No. 10 Civ. 4518, 2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013), *aff'd*, 758 F.3d 185 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 578 U.S. 212 (2016). In 2008, the District Court for the Southern District of New York issued a writ of execution levied upon Citibank and a separate writ against Clearstream to restrain the Markazi bonds and associated accounts. *See id.* at *5. Section 8772 specifically limits its application to the assets at issue in this case and those at issue in *Peterson I. See* 22 U.S.C. § 8772(b).

22 U.S.C. §§ 8772(a)(1); 8772(b).

Following this statutory amendment, the Supreme Court granted

certiorari, vacated this Court's judgment, and remanded the case to this Court

"for further consideration in light of" the amendment. *Bank Markazi v. Peterson*,

140 S. Ct. 813 (2020) (mem.); *Clearstream Banking S.A. v. Peterson*, 140 S. Ct. 813

(2020) (mem.). This Court then vacated the judgment of the district court in part

and remanded the case to the district court for it to consider the implications of

the amended Section 8772 with respect to the court's jurisdiction for turnover. *See*

*Peterson v. Islamic Republic of Iran*, 963 F.3d 192, 196 (2d Cir. 2020) (per curiam).

The Plaintiffs then moved for summary judgment on their turnover claims, while

Bank Markazi, Clearstream, and UBAE moved to dismiss the claims against

them.  In their motions to dismiss, both Bank Markazi and Clearstream argued

that the district court lacked personal jurisdiction over them and that Section

8772 is unconstitutional for various reasons.  Bank Markazi also argued that the

district court lacked subject matter jurisdiction over the claim against it.

The district court (Preska, *Judge*) granted the Plaintiffs' motion for

summary judgment and denied both Clearstream's and Bank Markazi's motions

to dismiss. Specifically, the court held that: (1) Both New York's longarm statute

11

and constitutional due process permitted the exercise of personal jurisdiction in New York over Clearstream; (2) Section 8772 stripped Bank Markazi of its foreign sovereign immunity and affirmatively granted subject matter jurisdiction over these turnover proceedings with respect to Bank Markazi; (3) the FSIA and principles of constitutional due process permitted the exercise of personal jurisdiction over Bank Markazi; and (4) Clearstream's and Bank Markazi's challenges to the constitutionality of Section 8772 were meritless.

The district court also held that no triable issue of fact remained as to any of Section 8772's elements—notably, that no one other than Bank Markazi had a beneficial interest in the Assets—and granted the Plaintiffs' motion for summary judgment.  Accordingly, the district court issued an order requiring Clearstream and Bank Markazi to turn over the Assets to the Plaintiffs, granted a stay of the turnover pending the outcome of this appeal, and enjoined Clearstream and Bank Markazi from transferring any assets out of Account 13675 in Luxembourg or taking any action to frustrate the turnover order.  Bank Markazi and Clearstream appealed, while UBAE, JPMorgan, and the Islamic Republic of Iran—which has not appeared at any point in this action—did not.

On the appeal now before us, Bank Markazi argues that the district court lacked both personal and subject matter jurisdiction over the proceeding against it and that Section 8772 is unconstitutional. Clearstream argues that the district court lacked personal jurisdiction over it, that Section 8772 is unconstitutional, and that triable issues of fact remain such that a grant of summary judgment in favor of the Plaintiffs was improper.

## DISCUSSION

I.      Subject Matter Jurisdiction over Proceeding Against Bank Markazi

"This Court reviews issues of subject matter jurisdiction, which turn on questions of law, de novo." *Landau v. Eisenberg*, 922 F.3d 495, 497 (2d Cir. 2019) (per curiam).

A.      <u>Legal Standard</u>

"Congress, having the power to establish the courts, must define their respective jurisdictions." *Sheldon v. Sill*, 49 U.S. 441, 448 (1850). Pursuant to this authority, Congress has set strict limitations on the exercise of personal and subject matter jurisdiction in actions against foreign sovereigns in federal and state courts through the FSIA. The FSIA "provides the 'sole basis for obtaining jurisdiction over a foreign state in our courts,'" *Vera v. Banco Bilbao Vizcaya*

*Argentaria, S.A.*, 946 F.3d 120, 132–33 (2d Cir. 2019) (quoting *Argentine Republic v.*

*Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)), and "'must be applied . . .

in every action against a foreign sovereign,'" *id*. (quoting *Verlinden B.V. v. Cent.*

*Bank of Nigeria*, 461 U.S. 480, 493 (1983)).

Section 1604 of the FSIA provides that "a foreign state shall be immune

from the jurisdiction of the courts of the United States and of the States except as

provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604. This so-called

"jurisdictional immunity" refers to immunity from both personal jurisdiction and

statutory subject matter jurisdiction. *See Verlinden*, 461 U.S. at 485 n.5 ("[I]f none

of the exceptions to sovereign immunity set forth in the Act applies, the District

Court lacks both statutory subject matter jurisdiction and personal jurisdiction.").

When a foreign state's jurisdictional immunity under Section 1604 has been

stripped through one of the exceptions in Sections 1605–1607, 28 U.S.C. § 1330

provides an affirmative grant of subject matter and personal jurisdiction.

In addition to establishing this jurisdictional immunity framework for

foreign states, the FSIA separately immunizes "the property in the United States

of a foreign state . . . from attachment[,] arrest[,] and execution except as

provided in [28 U.S.C. §§] 1610 and 1611." 28 U.S.C. § 1609. These two types of

14

immunity—"jurisdictional immunity" and "execution immunity"—"operate independently," such that an abrogation of one immunity has no bearing on whether the other, too, is abrogated. *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 288 (2d Cir. 2011).

The parties do not dispute that Bank Markazi is a foreign sovereign within the meaning of the FSIA and that no provision of the FSIA strips Bank Markazi of its jurisdictional immunity in this turnover action. The Plaintiffs argue, however, that Section 8772 abrogates Bank Markazi's jurisdictional immunity, or alternatively, that the district court possesses ancillary subject matter jurisdiction over the claims against Bank Markazi based on the jurisdiction established in the District Court for the District of Columbia in the merits actions that produced the judgments the Plaintiffs now seek to enforce.

The district court determined "that Section 8772 provides an independent grant of jurisdiction" without addressing the Plaintiffs' ancillary jurisdiction argument. Special Appendix ("SPA") at 40. We disagree and conclude that neither Section 8772 nor principles of ancillary jurisdiction provide the district court with subject matter jurisdiction over the Plaintiffs' turnover claim against Bank Markazi.

15

B.       Abrogation

In support of their argument that Section 8772 abrogates Bank Markazi's

jurisdictional immunity under the FSIA and provides subject matter jurisdiction

over their turnover claim, the Plaintiffs rely on Section 8772's "notwithstanding

clause," which, as quoted above, states:

> [N]otwithstanding any other provision of law, including any
> provision of law relating to sovereign immunity, and preempting
> any inconsistent provision of State law, a financial asset that [meets
> the specifications of subsections (a)(1)(A)–(C)] shall be subject to
> execution or attachment in aid of execution, or to an order directing
> that the asset be brought to the State in which the court is located
> and subsequently to execution or attachment in aid of execution . . . .

22 U.S.C. § 8772(a) (emphasis added). Bank Markazi concedes that this provision

strips the *execution* immunity of the Assets but argues that the clause does not

reach the separate *jurisdictional* immunity that the FSIA confers on Bank Markazi.

We agree that the notwithstanding clause is not so broad as to abrogate Bank

Markazi's jurisdictional immunity.

As a matter of statutory construction, "the use of such a 'notwithstanding'

clause clearly signals the drafter's intention that the provisions of the

'notwithstanding' section override *conflicting* provisions of any other section."

*Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (emphasis added). But, as the

district court acknowledged, this does not mean that the clause should be read to

16

override any provision of law that "would impede Plaintiffs' recovery." SPA at 27. Rather, the operative question is whether provisions in the statute containing the notwithstanding clause conflict with the FSIA's grant of jurisdictional immunity to Bank Markazi. *See Smith v. Fed. Res. Bank of N.Y.*, 346 F.3d 264, 271 (2d Cir. 2003) (noting that "the 'notwithstanding' clause applies only when some 'other provision of law' conflicts" with the terms of the statute in which the notwithstanding clause appears).

"As with any question of statutory interpretation, we begin" our analysis "with the text of the statute." *United States v. Epskamp*, 832 F.3d 154, 162 (2d Cir. 2016) (internal quotation marks omitted). Although Section 8772's notwithstanding clause explicitly disclaims "any provision of law relating to sovereign immunity," the concept of "sovereign immunity" is broad and may encompass, among other things, the FSIA's grant of jurisdictional immunity to foreign sovereigns and the execution immunity that extends to their assets located in the United States. The remainder of Section 8772 is no more specific; it speaks only of assets that are "subject to execution or attachment in aid of execution, or to an order directing" turnover for attachment or execution, 22 U.S.C. § 8772(a), without discussing or drawing any distinction between the

17

execution immunity of the assets targeted by the statute and the jurisdictional immunity of the foreign-sovereign owner of those assets.

In the absence of an explicit reference to jurisdictional immunity, we find nothing else in the statute to suggest that the notwithstanding clause's reference to "sovereign immunity" was intended to go beyond the execution immunity provided to the assets under the FSIA and reach the jurisdictional immunity provided by the same statute to Iran and its instrumentalities. Section 8772 applies only to assets "held by or for a foreign securities intermediary doing business in the United States." 22 U.S.C. § 8772(a)(1)(A). It is therefore unnecessary for a court to exercise jurisdiction over a foreign sovereign to accomplish the turnover contemplated by Section 8772. This is because New York law, which governs the proceedings targeted by Section 8772, allows a court to order turnover of a judgment debtor's property by exercising jurisdiction only over a garnishee custodian of the property, like Clearstream. *See Koehler v. Bank of Bermuda Ltd.*, 911 N.E.2d 825, 831 (N.Y. 2009) (concluding that "regardless of whether the defendant is a judgment debtor or a garnishee" holding property of the judgment debtor, "a New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property");

18

*see also* Plaintiffs' Br. at 73 ("In any event, . . . courts need not obtain jurisdiction over judgment debtors to issue turnover orders against garnishees like Clearstream."). Because Section 8772 addresses only the availability of specific assets for execution, and the jurisdictional immunity of Bank Markazi has no bearing on the availability of those assets, we find no conflict between the terms of Section 8772 and the jurisdictional immunity that Bank Markazi possesses under the FSIA. We therefore read the notwithstanding clause as abrogating only the execution immunity of the assets,[3] leaving Bank Markazi's jurisdictional immunity intact.

The Plaintiffs argue that this Court's case law interpreting Section 201 of the Terrorism Risk Insurance Act (TRIA), which "parallels [Section 8772] in

---

[3] It may seem counterintuitive to read the statute as abrogating only the execution immunity of the Assets when, under present circumstances, the Luxembourg-based Assets possess no execution immunity. *See* 28 U.S.C. § 1609 (granting execution immunity only to "the *property in the United States* of a foreign state." (emphasis added)). It may appear, for instance, to conflict with the principle of statutory interpretation that "'[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 227 (2d Cir. 2021) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). However, Section 8772's abrogation of execution immunity still plays a meaningful role in allowing the Plaintiffs to reach the Assets. In an earlier opinion in this case, we noted that if the Assets were brought into the United States pursuant to a turnover order it would then be necessary to conduct an execution immunity analysis under the FSIA because they would become assets "in the United States." *See Peterson II*, 876 F.3d at 94. After that opinion was issued, Congress amended Section 8772 to specifically reach the Assets, NDAA 2020, 133 Stat. at 1645–46, eliminating the need to conduct this analysis if the Assets are delivered to the United States pursuant to a turnover order.

critical respects," requires a different result. Plaintiffs' Br. at 60–61. Section 201(a)

of TRIA provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA, Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337-40 (2002) (codified at 28

21 U.S.C. § 1610 note).[4] In arguing that our previous interpretation of TRIA ties

our hands when interpreting Section 8772, the Plaintiffs rely primarily on

*Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010), a proceeding to

enforce a judgment obtained against Iran using property held in the United

States by Bank Melli, an instrumentality of the Iranian government. Bank Melli

argued that Section 201(a) of TRIA did "not provide jurisdiction for a court to

---

[4] TRIA is presently inapplicable to this case because it applies only to assets that have been "seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act . . . or under sections 202 and 203 of the International Emergency Economic Powers Act." TRIA § 201(d)(2)(A), 116 Stat. at 2339. Although Executive Order 13599, issued under the International Emergency Economic Powers Act, blocked "[a]ll property and interests in property of the Government of Iran, including the Central Bank of Iran," this block extended only to property located "in the United States" or "within the possession or control of any United States person." Exec. Order No. 13,599, § 1(a), 77 Fed. Reg. 6659, 6659 (Feb. 5, 2012).

permit attachment against a party that was not itself the subject of the underlying judgment." *Id*. at 48–49.

This Court reasoned that, because TRIA explicitly extends not only to the assets of the terrorist party against which judgment was obtained, but also to the assets of "any agency or instrumentality of that terrorist party," the statute provided an "independent grant of jurisdiction over the agencies and instrumentalities" that were not party to the original proceeding and that might ordinarily be immune under the FSIA. *Id*. at 49. Without extending "subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor," TRIA's provision making "the blocked assets of any agency or instrumentality of that terrorist party" subject to execution would be extremely limited. *Id*. at 50. Because of the textual similarities between TRIA and Section 8772, the Plaintiffs argue, our reasoning in *Weinstein* requires us to find an independent grant of subject matter jurisdiction in Section 8772.

This argument ignores the reason this Court read TRIA to abrogate jurisdictional immunity: if TRIA did not create "an independent grant of jurisdiction over the agencies and instrumentalities" of terrorist parties, it would

21

be extremely difficult for plaintiffs to access the assets contemplated by the statute. *Id.* at 49. This would render TRIA's provision allowing claimants to recover the "blocked assets of any agency or instrumentality of that terrorist party . . . a nullity." *Id.* By contrast, an independent grant of jurisdiction is unnecessary to reach the assets targeted by Section 8772.

Section 8772 specifically and solely targets assets held by third parties, as opposed to those held by a foreign sovereign judgment debtor or its instrumentalities. *See* 22 U.S.C. § 8772(a) (applying only to "a financial asset that is . . . held by or for a foreign securities intermediary doing business in the United States"). By comparison, TRIA is a statute of much broader applicability, intended "to deal *comprehensively* with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties." *Weinstein*, 609 F.3d at 50 (quoting 148 Cong. Rec. S11524, at S11528 (Nov. 19, 2002) (statement of Sen. Harkin ("Harkin Statement")) (emphasis added). TRIA was intended to reach "any assets available in the U.S.," Harkin Statement, and applies "in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism," TRIA § 201(a). It was precisely because TRIA

22

needed to be able to reach "property held in the hands of an instrumentality of the judgment-debtor" that we interpreted the statute to provide a grant of subject matter jurisdiction over proceedings against those instrumentalities involving that property. *Weinstein*, 609 F.3d at 50. Without the ability to exercise this jurisdiction, TRIA's reach would be significantly curtailed.

Section 8772, on the other hand, addresses only assets that are both 1) the subject of judgment enforcement proceedings initiated in the Southern District of New York and 2) "held by or for a foreign securities intermediary." 22 U.S.C. § 8772. It has no application to property held by the judgment debtor or its instrumentalities. As discussed above, under New York law, which applies in the proceedings targeted by Section 8772 by operation of Federal Rule of Civil Procedure 69, assets of a judgment debtor are subject to execution without bringing any further claim or exercising jurisdiction over the judgment debtor. *See, e.g., Koehler*, 911 N.E.2d at 831 ("[A] New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property regardless of whether the defendant is a judgment debtor or a garnishee."). While it may have been necessary under TRIA to abrogate the jurisdictional immunity of a judgment debtor's instrumentality in order to reach assets held by

that instrumentality, a similar abrogation is unnecessary to reach assets held by a garnishee in the much narrower set of circumstances to which Section 8772 applies. We decline to interpret Section 8772 as abrogating Bank Markazi's jurisdictional immunity or providing an independent grant of jurisdiction over claims against Bank Markazi where such an interpretation is both unsupported by the statutory text and unnecessary to give meaning to the statutory language.

Because Section 8772 neither abrogates Bank Markazi's jurisdictional immunity nor provides an independent grant of subject matter jurisdiction over claims against Bank Markazi, we vacate the portion of the district court's order that relied on Section 8772 as a basis for exercising subject matter jurisdiction over the Plaintiffs' turnover claim against Bank Markazi.

C.   Ancillary Jurisdiction

Even if Section 8772 does not independently permit the exercise of subject matter jurisdiction over the Plaintiffs' claims against Bank Markazi, the Plaintiffs argue, Bank Markazi is subject to the so-called "ancillary jurisdiction" of the federal courts based on the proceedings in which they secured their judgments against Iran.  Federal courts "may exercise ancillary jurisdiction '(1) to permit disposition by a single court of claims that are, in varying respects and degrees,

24

factually interdependent; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees.'" *Peacock v. Thomas*, 516 U.S. 349, 354 (1996) (quoting *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 379–80 (1994)). In general, "[w]here subject matter jurisdiction under the FSIA exists to decide a case, jurisdiction continues long enough to allow proceedings in aid of any money judgment that is rendered in the case." *First City, Texas–Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 54 (2d Cir. 2002). The Plaintiffs argue that this principle of ancillary jurisdiction is sufficient to extend subject matter jurisdiction over this proceeding against Bank Markazi, despite the fact that Bank Markazi was not party to the litigation in which the Plaintiffs secured their judgments against Iran.

Ancillary jurisdiction does not extend, however, to "an action to establish liability on the part of a third party." *Epperson v. Ent. Express, Inc.*, 242 F.3d 100, 104 (2d Cir. 2001*); see also Peacock*, 516 U.S. at 357 ("We have never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment."). As the First Circuit has explained, *Peacock* draws a distinction between "an attempt simply to collect a judgment duly rendered by a federal

court, even if chasing after the assets of the judgment debtor now in the hands of a third party"—in which case ancillary jurisdiction exists—and a proceeding that "presents a new substantive theory to establish liability directly on the part of a new party"—in which case "some independent ground is necessary to assume federal jurisdiction over the claim." *U.S.I. Props. Corp. v. M.D. Constr. Co.*, 230 F.3d 489, 498 (1st Cir. 2000); *see also Epperson*, 242 F.3d at 103–07 (drawing "a distinction between post-judgment proceedings to collect an existing judgment and proceedings, such as claims of alter ego liability and veil-piercing, that raise an independent controversy with a new party in an effort to shift liability."). In *Peacock*, the Supreme Court stated that ancillary jurisdiction can extend to garnishment and attachment proceedings against a third-party custodian of a judgment debtor's assets, but that claims like veil-piercing fall outside the scope of ancillary jurisdiction because they "involve[] new theories of liability not asserted in the [earlier] suit." 516 U.S. at 356–59; *see also Epperson*, 242 F.3d at 105 ("[V]eil-piercing claims in a subsequent action require an independent jurisdictional basis.").

The Plaintiffs' claims with respect to Clearstream and Bank Markazi effectively illustrate this distinction. As discussed above, under New York law,

turnover can be sought from either the judgment debtor, *see* N.Y. C.P.L.R.

5225(a), *or* from a third-party custodian or transferee of assets belonging to the

judgment debtor, *see* N.Y. C.P.L.R. 5225(b). Clearstream does not own the Assets

and is not substantively liable for satisfying the judgments that the Plaintiffs

hold. The Plaintiffs seek a turnover order against Clearstream solely by virtue of

the fact that Clearstream currently holds assets that, under Section 8772, belong

to the Islamic Republic of Iran, the judgment debtor. Ancillary jurisdiction would

therefore extend over the Plaintiffs' turnover claim against Clearstream, which

seeks garnishment of Iranian assets held by Clearstream. *See Peacock*, 516 U.S. at

357.

Bank Markazi, however, is neither the custodian of the Assets nor the

judgment debtor, given that it was not a party to the cases in which the Plaintiffs

secured their judgments against Iran. Instead, the Plaintiffs argue that Bank

Markazi may be subject to a turnover order because Section 8772 makes Bank

Markazi Iran's "alter ego," allowing Bank Markazi's assets to be used to satisfy

the judgments that the Plaintiffs hold against Iran. *See, e.g.*, App'x at 48 ("Iran

dominates and controls Markazi's actions, thereby rendering Markazi a mere

alter ego of Iran . . . ."); *id*. at 70 ("Plaintiffs may collect their Judgment under

FSIA and TRIA against assets owned by Markazi because Markazi is an agency

or instrumentality of Iran and Iran's alter ego."); *id*. at 2291 (arguing that Bank

Markazi is "statutorily treated as the sovereign's alter ego"); *id*. at 2490 ("[T]he

statute, for certain purposes, makes Markazi the alterego of Iran"). Although

here the Plaintiffs rely on Section 8772 rather than common law alter ego

principles to support their veil-piercing theory, their turnover claim against Bank

Markazi is ultimately an attempt to "establish liability directly on the part of a

new party." *U.S.I. Props. Corp.*, 230 F.3d at 498. Under *Peacock*, ancillary

jurisdiction cannot extend to this type of claim.[5]

The Plaintiffs attempt to evade the application of *Peacock* by arguing that

Bank Markazi is not a new party because Section 8772 eliminates the distinction

---

[5] The Plaintiffs argue that *Peacock* is inapplicable to this case because we "considered and distinguished *Peacock*" during our discussion of subject matter jurisdiction in *Weinstein*. Plaintiffs' Br. at 72. This overstates our treatment of *Peacock* in *Weinstein*, which only noted defendant Bank Melli's argument that the enforcement proceeding brought by the plaintiffs was jurisdictionally independent from the earlier merits proceeding against Iran. *Weinstein* did not hold that ancillary jurisdiction could be exercised over a claim against Bank Melli based on the jurisdiction established in the earlier proceeding to which it was not a party. Instead, we looked to the independent grant of subject matter jurisdiction in TRIA to sustain the enforcement proceeding against Bank Melli, which would not be necessary under *Peacock* if ancillary jurisdiction could extend over enforcement proceedings against a foreign sovereign's instrumentality that was not party to the earlier proceeding. *Weinstein*, 609 F.3d at 49–50. *Weinstein* therefore supports our conclusion that a post-judgment enforcement proceeding against an instrumentality of the foreign sovereign judgment debtor cannot be supported by ancillary jurisdiction from the proceeding in which the judgment was issued, but must instead have an "independent basis for jurisdiction." *Peacock*, 516 U.S. at 355.

between Iran and Bank Markazi for the purposes of ancillary jurisdiction.

Plaintiffs' Br. at 62 ("§8772's elimination of the distinction between Markazi and

Iran dictates that ancillary jurisdiction principles apply to the Bond Proceeds . . .

."). This argument unfolds in two parts: First, the Plaintiffs argue that the

Supreme Court's holding in *First Nat'l City Bank v. Banco Para El Comercio Exterior*

*de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), allows courts to "overcome the

presumption that sovereigns and their instrumentalities are separate entities . . .

'to extend' the ancillary enforcement jurisdiction over a sovereign judgment

debtor to reach the assets of that debtor's instrumentalities." Plaintiffs' Br. at 63.

Second, instead of attempting to satisfy the test established in *Bancec*, the

Plaintiffs argue that "Section 8772 relieves Plaintiffs of the burden of satisfying

the *Bancec* factors by statutorily stripping Markazi of its separate juridical

status." *Id*. In short, they claim that ancillary jurisdiction can ordinarily be

extended when the factors identified in *Bancec* are satisfied, and that there is no

need to conduct a *Bancec* analysis in this instance because Section 8772

supersedes the *Bancec* requirements.

This argument fails at both steps. To start, we are aware of no case—and

the Plaintiffs cite none—in which this Court has held that *Bancec* may be used to

29

extend ancillary jurisdiction from a merits proceeding against a foreign sovereign to a new proceeding seeking to establish liability for the judgment on the part of the foreign sovereign's agency or instrumentality.[6] Ordinarily, *Bancec* stands for the proposition "that a foreign state instrumentality is answerable just as its sovereign parent would be if the foreign state has abused the corporate form, or where recognizing the instrumentality's separate status works a fraud or an injustice," *De Letelier v. Republic of Chile*, 748 F.2d 790, 794 (2d Cir. 1984), and is used to overcome the "presumption that assets of a foreign government instrumentality could not be executed upon to satisfy a judgment against a parent foreign government," *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 477 (2d Cir. 2007). These principles established in *Bancec* do nothing to alter the limits of ancillary jurisdiction as established in *Peacock*.

With respect to the second part of the Plaintiffs' argument, even if it were proper to rely on *Bancec* to extend ancillary jurisdiction, Section 8772 would not

---

[6] The Plaintiffs rely on *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019). In that case, though, the plaintiffs brought their post-judgment proceeding against the foreign sovereign itself while seeking to attach assets belonging to the sovereign's instrumentality. Unlike in this case, the district court had no need to exercise jurisdiction over a claim against the instrumentality. But to the extent that the *Crystallex* court based its jurisdictional holding on a determination that ancillary jurisdiction extends to post-judgment proceedings against a foreign sovereign's instrumentality that was not party to the underlying merits proceeding, we disagree.

eliminate the need to conduct a *Bancec* analysis because Section 8772 does not purport to eliminate the distinction between Iran and its instrumentalities for all intents and purposes. Instead, it eliminates the distinction between Iran and its instrumentalities for the limited purpose of identifying the assets to which Section 8772 applies, making certain assets of "Iran" available for turnover, execution, and attachment, and defining "Iran" to include its instrumentalities like Bank Markazi. *See* 22 U.S.C. § 8772(d)(3). This definition seems clearly intended to eliminate the need to apply *Bancec* to determine whether Bank Markazi's assets may be used to satisfy the Plaintiffs' outstanding judgments against Iran, but it does not follow that—if *Bancec* could be used to extend ancillary jurisdiction—Congress intended Section 8772 to eliminate the need to apply *Bancec* to answer the ancillary jurisdiction question as well. As noted above, the fact that Congress has acted to make these assets available for execution does not imply that Congress also intended to extend subject matter jurisdiction over claims against the non-custodial owner of those assets. Because Section 8772 is silent with respect to the extension of ancillary jurisdiction to new claims against Iran's instrumentalities that were not involved in the Plaintiffs'

31

earlier litigation against Iran, we reject the Plaintiffs' argument that the statute authorizes such an extension.

Because Section 8772 neither abrogates Bank Markazi's jurisdictional immunity nor provides an independent grant of subject matter jurisdiction over claims against Bank Markazi, and because the Plaintiffs' turnover claim falls outside the scope of the district court's ancillary jurisdiction, the district court lacked subject matter jurisdiction over the turnover claim against Bank Markazi. We therefore vacate the judgment of the district court with respect to Bank Markazi and remand for the district court to determine whether, under Federal Rule of Civil Procedure 19, the litigation can proceed in Bank Markazi's absence. *See* Fed. R. Civ. P. 19(a) (describing when a party is required to be joined if feasible); Fed. R. Civ. P. 19(b) ("If a [required party] cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed.").[7]

---

[7] We need not reach Bank Markazi's arguments regarding personal jurisdiction and the constitutionality of Section 8772. And although the parties have briefed the Rule 19 issue, "[i]t is ordinarily appropriate for us to vacate the judgment . . . and remand" to the district court when a Rule 19 issue arises for the first time on appeal. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 132 (2d Cir. 2013); *see also CP Sols. PTE, Ltd. v. Gen. Elec. Co.*, 553 F.3d 156, 161 (2d Cir. 2009). Although this Court will occasionally reach a Rule 19 issue that has not yet been addressed by the district court, this is appropriate only when the fully developed record demonstrates that "only one possible resolution of such an issue would fall 'within the permissible range of

## II. Personal Jurisdiction over Clearstream

## A. Legal Standard

"When considering a district court's ruling on personal jurisdiction, 'we review its factual findings for clear error and its legal conclusions *de novo*.'" *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 68 (2d Cir. 2022) (quoting *Frontera Res. Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 582 F.3d 393, 395 (2d Cir. 2009)).

When assessing whether specific personal jurisdiction "exists over a non-domiciliary, we first consider whether the state's longarm statute provides a statutory basis for jurisdiction and, if so, whether exercising personal jurisdiction would comport with due process." *Edwardo v. Roman Catholic Bishop of Providence*, 66 F.4th 69, 73 (2d Cir. 2023) (per curiam).

## B. Longarm Statute

New York's longarm statute, N.Y. C.P.L.R. 302(a), permits the exercise of personal jurisdiction over a non-domiciliary such as Clearstream if (1) "the defendant 'transacts any business' in New York," and (2) the underlying "cause

---

choices'—in other words, where only one determination by the district court would be within its discretion." *Kirby*, 726 F.3d at 132. In this instance, the Rule 19 analysis with respect to Bank Markazi raises a number of fact-intensive questions, so remand to the district court, which is better equipped to address these complicated factual issues, is warranted.

of action 'aris[es] from' such a business transaction." *Licci ex rel. Licci v. Leb. Can. Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012) ("*Licci I*") (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (quoting N.Y. C.P.L.R. 302(a)(1))). Clearstream's New York business activities undisputedly satisfy the first of these requirements, so we focus solely on whether the Plaintiffs' cause of action "arises from" Clearstream's New York business transactions. We conclude that it does.

To determine whether the Plaintiffs' cause of action arises from Clearstream's New York business transactions, we must first identify the underlying cause of action. Under Federal Rule of Civil Procedure 69, post-judgment proceedings to enforce a money judgment "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Fed. R. Civ. P. 69. In New York, "CPLR article 52 sets forth procedures for the enforcement of money judgments," with "the delivery or turnover proceedings described in CPLR 5225 and 5227 chief among them." *Cruz v. T.D. Bank*, 22 N.Y.3d 61, 66, 74 (N.Y. 2013). While no analogous enforcement mechanism exists under federal law, *see CSX Transp. v. Island Rail Terminal*, 879 F.3d 462, 469 (2d Cir. 2018), N.Y. C.P.L.R. 5225(b) provides a cause of action through which a judgment creditor may institute a "special proceeding" to

recover assets of the judgment debtor from a third party "in possession or custody of" the assets. N.Y. C.P.L.R. 5225(b). Throughout their amended complaint, the Plaintiffs repeatedly invoke this cause of action as a basis for the relief they seek. *See* App'x at 46 ("Amended Complaint Pursuant to N.Y. C.P.L.R. 5225 and 5227"); *id*. at 51 ("This proceeding arises under Fed. R. Civ. P. 69(a), which incorporates the applicable law of the State of New York and the United States."); *id*. at 68 ("Under New York judgment enforcement procedure, this Court may order Clearstream and JP Morgan to deliver any assets of Iran or Markazi in its possession or control to satisfy Plaintiffs' judgment."); *id*. at 101 ("FOURTH COUNT (Against All Defendants for Turnover Pursuant to CPLR § 5225)"). In light of the foregoing, it would seem uncontroversial that N.Y. C.P.L.R. 5225 provides the cause of action through which the Plaintiffs seek to obtain a turnover order against Clearstream.

However, the Plaintiffs argue that it is Section 8772 that provides the cause of action here, despite conceding that their Complaint makes no mention of this statute. According to the Plaintiffs, Section 8772 "authorizes Plaintiffs to satisfy their judgments by commencing an enforcement proceeding" and establishes

"[e]ach of the requirements for proving that claim." Plaintiffs' Br. at 26.[8] We

disagree.

Implied rights of action are "disfavored," and we will not read a statute as

creating one "in the absence of clear evidence of legislative intent" to do so. *Moya*

*v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 128 (2d Cir. 2020); *see also*

*Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("Statutory intent . . . is

determinative. Without it, a cause of action does not exist and courts may not

create one . . . ." (citations omitted)). Here, Section 8772 lacks any markers of

congressional intent to create a cause of action. As the Supreme Court explained

in *Peterson I*, Congress originally passed Section 8772 "[t]o place beyond dispute

the availability of [certain] assets for satisfaction of judgments rendered in

terrorism cases" against Iran. 578 U.S. 212, 218 (2016). The statute makes certain

assets "subject to execution or attachment in aid of execution, or [turnover], in

order to satisfy" terrorism-related judgments against Iran, 22 U.S.C. § 8772(a)(1),

---

[8] The district court appears to have accepted the Plaintiffs' contention that Section 8772 provides the cause of action without considering alternatives, *see* SPA at 33, possibly due to Clearstream's failure to vigorously contest this point. To the extent that Clearstream waived this argument, we nevertheless exercise our discretion to reach this question. *See United States v. Brunner*, 726 F.3d 299, 304 (2d Cir. 2013) ("[W]e are free to exercise our discretion to consider waived arguments. Exercise of that discretion is particularly appropriate where an argument presents a question of law and does not require additional fact finding." (internal quotation marks and citation omitted)).

but it contains no language to suggest that it was intended to create a cause of action for these enforcement proceedings. *See Lopez v. Jet Blue Airways*, 662 F.3d 593, 597 (2d Cir. 2011) (finding no cause of action in the Air Carrier Access Act of 1986 because, among other things, the statute "does not expressly provide any right to sue"). At the same time, the assets made available under Section 8772 are specifically defined in reference to the proceedings in which they are sought, which were already underway at the time the statute was enacted and amended. *See* 22 U.S.C. § 8772(b) (reaching only the assets "identified in and the subject of proceedings in the United States District Court for the Southern District of New York in . . . Case No. 10 Civ. 4518 . . . [and] Case No. 13 Civ. 9195"). There would be little reason for Congress to create a new cause of action when causes of action already existed and were being utilized by the Plaintiffs in the proceedings that Section 8772 targets. *Cf. Moya*, 975 F.3d at 128 ("The availability of . . . alternative mechanisms to enforce" a statute "strongly suggests that Congress did not intend to imply a superfluous private right of action").

A comparison of Section 8772 with Section 1605A—which "create[s] an express federal cause of action for acts of terror" under the FSIA, *Opati v. Republic of Sudan*, 590 U.S. 418, 422 (2020)—underscores the lack of clear legislative intent

to create a private cause of action in Section 8772. Section 1605A of the FSIA

explicitly establishes a "private right of action," 28 U.S.C. § 1605A(c), while also

outlining the circumstances under which a "court shall hear a claim under this

section," *id*. § 1605A(a)(2), and the limitations period during which an "action

may be brought or maintained under this section," *id*. § 1605A(b). Lacking any of

these features, Section 8772 much more closely resembles Section 1610(g) of the

FSIA, which only "serves to identify property that will be available for

attachment and execution." *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 205

(2018); *see id.* at 218 (holding that Section 1610(g) "expands the assets available

for attachment and execution . . . with respect to judgments held under §

1605A"). "[W]hen, as here, Congress has shown that it knows how to adopt the

omitted language or provision," it is "particularly inappropriate" for a court to

supplement the statutory framework with features that do not appear in the text.

*Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019).

We therefore reject the Plaintiffs' argument and the district court's

determination that Section 8772 supplies the cause of action here, and instead

conclude that N.Y. C.P.L.R. 5225(b) provides the cause of action through which

the Plaintiffs seek a turnover order against Clearstream.

Having identified the Plaintiffs' cause of action, we must next determine whether it "arises from" Clearstream's New York business transactions. To satisfy the "arising from" prong, "there must be an 'articulable nexus' or 'substantial relationship' between the business transaction[s in New York] and the claim asserted." *Licci v. Lebanese Canadian Bank* ("*Licci II*"), 984 N.E.2d 893, 901 (N.Y. 2012) (citations omitted); *see also Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("[W]here there is a showing that business was transacted, there must be a substantial nexus between the business and the cause of action." (internal quotation marks and citation omitted)). This analysis "is relatively permissive" and "varies according to the nature and elements of the particular causes of action pleaded." *Licci II*, 984 N.E.2d at 900–01. The determination of whether an articulable nexus exists is to be made "in light of all the circumstances," *id*. at 900, and only requires that the legal claim "not [be] completely unmoored" from "the defendant's New York business activity," *Licci ex rel. Licci v. Leb. Can. Bank* ("*Licci III*"), 732 F.3d 161, 168–69 (2d Cir. 2013). Ultimately, the question is whether the claim is "in some way arguably connected to the transaction." *Licci II*, 984 N.E.2d at 901.

Clearstream's New York contacts clear that bar. Between July 2008 and October 2012, Clearstream received 62 interest and principal payments originating from the Markazi bonds into the New York Account. It came "in[to the] possession or custody," N.Y. C.P.L.R. 5225(b), of the $1.68 billion right to payment in Luxembourg because each time Clearstream received a bond proceed payment into the New York Account on Bank Markazi's behalf it credited Account 13675 with a right to payment in the same amount. The right to payment in Luxembourg therefore reflects the proceeds of transactions that Clearstream undertook using the New York Account. Bank Markazi's "interest" in and purported "entitle[ment] to the possession of," *id*., the $1.68 billion could not exist without Clearstream's corresponding transactions in New York. Neither element of N.Y. C.P.L.R. 5225(b) can thus be extricated from the "frequen[t] and deliberate nature of [Clearstream]'s use of its correspondent account." *Licci III*, 732 F.3d at 168.[9] We therefore conclude that the Plaintiffs' cause of action for turnover under N.Y. C.P.L.R. 5225(b) "arises from" Clearstream's New York business transactions such that the exercise of personal jurisdiction over

---

[9] Because we conclude that Clearstream is subject to personal jurisdiction in New York, we do not reach the Plaintiffs' argument that Federal Rule of Civil Procedure 4(k) provides a basis for personal jurisdiction over Clearstream.

Clearstream with respect to the turnover claim complies with the New York

longarm statute.

C.      Due Process

Even though the state longarm statute is satisfied, the exercise of personal

jurisdiction over Clearstream must still "comport with the Due Process

Clause."[10] *Okla. Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico) S.A.*

*Institucion de Banca Multiple*, 92 F.4th 450, 456 (2d Cir. 2024). This analysis "has

two parts of its own: minimum contacts and reasonableness." *Id*. Because we

conclude that Clearstream's New York activities provide sufficient basis for

personal jurisdiction here, and because the exercise of that jurisdiction would be

reasonable, the district court properly exercised personal jurisdiction over

Clearstream with respect to the Plaintiffs' turnover claim.

   1. *Minimum contacts.*

To satisfy the minimum contacts requirement, "the defendant must take

some act by which it purposefully avails itself of the privilege of conducting

---

[10] We have previously noted that "the due process analysis in the personal jurisdiction context is basically the same under both the Fifth and Fourteenth Amendments, except that under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered." *Fuld v. Palestine Liberation Organization*, 82 F.4th 74, 81 (2d Cir. 2023) (internal quotation marks and citations omitted).

activities within the forum State." *Id*. (alterations adopted and internal quotation

marks omitted). At the same time, "the plaintiff's claims must arise out of or

relate to the defendant's contacts with the forum." *Id*. (alterations adopted and

internal quotation marks omitted).

Clearstream raises substantially the same arguments with respect to the

minimum contacts inquiry that it raised with respect to the applicability of New

York's longarm statute. For the same reasons discussed above regarding that

issue, we conclude that the Plaintiffs' claim for turnover "arises out of or relate[s]

to" Clearstream's New York business activities. *See Chloe v. Queen Bee of Beverly*

*Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) ("We conclude that assertion of

personal jurisdiction over [the defendant] comports with due process for the

same reasons that it satisfies New York's long-arm statute."); *see also generally*

*Licci III*, 732 F.3d at 170 (noting that, while "personal jurisdiction permitted

under [New York's] long-arm statute may theoretically be prohibited under due

process analysis, we would expect such cases to be rare").

2. *Reasonableness.*

Even when a defendant has sufficient contacts with the forum to support

the exercise of personal jurisdiction, we "must also determine whether the

exercise of personal jurisdiction is reasonable under the Due Process Clause." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024) (quoting *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 730 (2d Cir. 2012)). For this analysis, we look at five factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Id*. (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)). When the minimum contacts requirement has been satisfied, the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id*. (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002)).

Clearstream presents two arguments against the exercise of jurisdiction. First, it contends that allowing a judgment to be enforced using property located abroad would be an "[a]sserti[on of] jurisdiction beyond U.S. courts' traditional limits." Defendant Clearstream's Br. at 43. Clearstream is correct that there are few cases in which a U.S. court has exercised personal jurisdiction over a non-domiciliary garnishee in custody of the assets of a foreign sovereign's

instrumentality, which are themselves located abroad. However, this is not necessarily because the Due Process Clause forbids such an exercise of jurisdiction, but rather because U.S. courts "generally lack authority in the first place to execute against property in other countries*," Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 144 (2014),[11] and the issue is therefore unlikely to arise frequently. But as we recognized in an earlier opinion in this case, New York law—specifically C.P.L.R. 5225(b)—is one exception to the general principle that courts cannot reach extraterritorial property. *See Peterson II*, 876 F.3d at 91 ("The authority of courts sitting in New York with personal jurisdiction over a non-sovereign third party to order that third-party garnishee to produce in New York an extraterritorial asset seems clear enough."). The fact that this type of execution procedure is relatively uncommon, standing alone, does not render it unconstitutional.

---

[11] As we noted at an earlier stage of this litigation, "we do not understand the Supreme Court's observation [in *NML Capital*] to foreclose th[e] possibility" that a U.S. court may possess the authority to execute against extraterritorial property. *Peterson II*, 876 F.3d at 92; *see also id.* at 92 n.20 ("The Supreme Court observed [in *NML Capital*] that 'a writ of execution . . . can be served anywhere within the state in which the district court is held.' That statement of law pertains to service and is not a barrier to a court's exercise of jurisdiction in accordance with the jurisdictional boundaries established by the state in which the court resides." (citations omitted)).

Second, Clearstream argues that it would face "catastrophic double liability" if it were made to turn over the Assets in this proceeding and were then subjected to a restitution order for the right to payment in Luxembourg. Defendant Clearstream's Br. at 43. But, as noted above, Clearstream has made the decision to engage in business activities in New York, and regularly engages in bond transactions in the United States on behalf of clients around the world. The possibility that it could be subject to competing suits in multiple countries is a risk inherent in this type of international financial arrangement. While recognizing, as we have here, that Clearstream has purposefully availed itself of the laws of New York, it would be unfair to allow it to evade jurisdiction in the state simply because it could be subject to double liability, a risk that is assumed under well-established principles of New York law. *See, e.g.*, *Motorola Credit Corp. v. Uzan*, 978 F. Supp. 2d 205, 210 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 160 (2d Cir. 2014) (per curiam) (noting that "under New York law . . . banks assume the risk of double liability as an ordinary cost of doing business in multiple jurisdictions." (citing *Petrogradsky Mejdunarodny Kommerchesky Bank v. Nat'l City Bank of N.Y.*, 253 N.Y. 23, 38–40 (1930); *JPMorgan Chase Bank, N.A. v. Motorola, Inc.*, 846 N.Y.S.2d 171, 184 (App. Div. 2007)).

Because we find neither of Clearstream's arguments persuasive, it has failed to meet its burden of demonstrating that the exercise of personal jurisdiction in this instance would be unreasonable. We therefore affirm the district court's determination that it may exercise personal jurisdiction over Clearstream.

### III.    Constitutionality of Section 8772

Clearstream argues that Section 8772 violates the Fifth Amendment's Equal Protection Clause "[b]y targeting Clearstream and the right to payment held abroad in this case specifically and individually . . . without a rational basis." Defendant Clearstream's Br. at 54. As Clearstream notes, the reach of Section 8772 is specifically limited to assets "identified in and the subject of" this litigation and *Peterson I* that are "held by or for a foreign securities intermediary doing business in the United States." 22 U.S.C. §§ 8772(a)(1)(A), (b). By operation of these provisions, Clearstream argues, it is arbitrarily singled out and subjected to a burdensome turnover liability regime that applies to no one else. In effect, rather than targeting Clearstream based on membership in a protected class, Clearstream argues that Section 8772 subjects it to disparate treatment as a "class of one."

We review the constitutionality of Section 8772 *de novo*, "as we would any other federal statute." *United States v. Henry*, 888 F.3d 589, 596 (2d Cir. 2018). To make out a class-of-one equal protection claim, the claimant "must plausibly allege that he or she has been intentionally treated differently from others similarly situated and no rational basis exists for that different treatment." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018). This requires the claimant to "'show an extremely high degree of similarity between themselves and' . . . the persons alleged to receive irrationally different treatment." *Id*. (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)). In this context, the challenged statute is entitled to a "strong presumption of validity" and "must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Comm's*, 508 U.S. 307, 313–15 (1993).

Clearstream argues that the objectives identified by the district court—"ensuring that Iran is 'held accountable for paying Plaintiffs' judgments and sanctioning Iran,'" SPA at 39—are not furthered by the statute's targeting of Clearstream.  However, our role in reviewing a class-of-one equal protection challenge is not to scrutinize the efficacy of the challenged statute or to question

47

the wisdom of the rationales on which Congress may have relied; while "[t]he assumptions underlying these rationales may be erroneous, . . . the very fact that they are 'arguable' is sufficient" to survive rational basis review. *F.C.C.*, 508 U.S. at 320. Here, the notion that Congress targeted assets held by Clearstream in order to further the judgment enforcement efforts of a consolidated group of plaintiffs is more than "arguable"; it is directly supported by the text of the statute. *See* 22 U.S.C. § 8772(a)(2) (describing the findings that a court must make before issuing a turnover order under Section 8772 "[i]n order to ensure that Iran is held accountable for paying the [Plaintiffs' judgments] and in furtherance of the broader goals of this Act to sanction Iran").

In any event, there are many other plausible rationales to support the statute's focus on the assets held by Clearstream. As the Supreme Court explained in *Peterson I*, Congress originally passed Section 8772 "[t]o place beyond dispute the availability of [certain] assets for satisfaction of judgments rendered in terrorism cases" against Iran. 578 U.S. at 218. Doing so "renders [the assets] available" for "postjudgment execution claims filed by numerous plaintiffs who, in multiple civil actions, obtained evidence-based judgments against Iran together amounting to billions of dollars." *Id*. at 215. In short,

48

Congress passed and later amended the statute to ensure that plaintiffs holding judgments against Iran would be able to recover despite the obstacles put in place by the FSIA, *id*. at 217–18, which is sufficient to provide a legitimate basis for the statute. This rationale alone supplies the "reasonably conceivable state of facts that could provide a rational basis" to support Section 8772 against Clearstream's class-of-one challenge.

A class-of-one claim also fails when the party raising the claim cannot show that "the decisionmakers were aware that there were other similarly-situated individuals who were treated differently." *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 143 (2d Cir. 2010). Although the class of securities intermediaries to whom the statute might apply is narrow, Clearstream provides no evidence—and thus fails to carry its burden of demonstrating—that Congress was aware of other garnishees holding assets on behalf of Iran outside the United States at the time that Section 8772 was adopted or amended, so it is plausible that Congress chose to focus on these assets specifically because they were the only ones known to exist at the time that could satisfy the judgments held by the consolidated group of plaintiffs. This type of targeted, albeit piecemeal, enforcement is constitutionally permissible. *See F.C.C.*, 508 U.S. at 316–17 ("Evils

49

in the same field may be of different dimensions and proportions, requiring different remedies. . . . The legislature may select one phase of one field and apply a remedy there, neglecting the others.") (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955)).

Because Clearstream has failed to rebut the presumption that Section 8772 is constitutional, we affirm the district court's denial of Clearstream's equal protection challenge.

### IV. Summary Judgment

Having rejected Clearstream's challenges to the exercise of personal jurisdiction over it and the constitutionality of Section 8772, we turn to Clearstream's argument that the district court erred in granting summary judgment in favor of the Plaintiffs. "We review a district court's grant of summary judgment *de novo*." *Brandon v. Royce*, 102 F.4th 47, 54 (2d Cir. 2024). Summary judgment is warranted "only where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. (internal quotation marks and citation omitted). This requires us to "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Green v. Town of East Haven*,

952 F.3d 394, 406 (2d Cir. 2020) (quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006)).

The district court granted summary judgment in favor of the Plaintiffs after determining that all eight elements required for turnover of the Assets under Section 8772 were satisfied.[12] Clearstream contends that a triable issue of fact remains on two of these elements: first, whether Bank Markazi holds equitable title to, or a beneficial interest in the Assets in Account 13675, and second, whether no other entity holds a constitutionally protected interest in the Assets. *See* 22 U.S.C. § 8772(a)(2). According to Clearstream, under Luxembourg law, UBAE holds both a beneficial interest and a constitutionally protected

---

[12] As summarized by the district court,

> To recall the bond proceeds to New York pursuant to Section 8772 and then execute against those assets, Plaintiffs must prove that:
> (1) They hold terrorism-related judgments against Iran;
> (2) Clearstream is a foreign securities intermediary doing business in the United States;
> (3) the bond proceeds are the financial assets at issue in this litigation;
> (4) Clearstream is holding those financial assets;
> (5) Markazi holds equitable title to, or a beneficial interest in[,] the bond proceeds;
> (6) the bond proceeds are equal in value to a financial asset of Markazi that Clearstream or UBAE is holding abroad;
> (7) the bond proceeds would be blocked assets if Clearstream were holding them in the U.S.; and
> (8) No other entity holds a constitutionally protected interest in the bond proceeds.

SPA at 50 (internal quotation marks and citations omitted).

interest in the Assets in Account 13675, while Bank Markazi holds no beneficial interest. The district court declined to analyze the interests at issue under Luxembourg law after determining that "Section 8772(a)(1)'s broad 'notwithstanding' clause plainly preempts any provision of Luxembourg law here." SPA at 54. As with the Plaintiffs' arguments regarding Bank Markazi's jurisdictional immunity, this interpretation of Section 8772 reads the notwithstanding clause too broadly. We therefore vacate the district court's grant of summary judgment in favor of the Plaintiffs and remand the case for the district court to determine, as a matter of state law,[13] which entities hold interests in the Assets, then to apply Section 8772 in light of those interests.

Section 8772 provides no definition of the ownership interests to which it extends, and so poses no direct conflict with the definitions of those terms provided by state law. "[A]bsent any indication that Congress intended a special definition of" the terms "equitable title," "beneficial interest," or "constitutionally protected interest," these "interests are ordinarily those created and defined by state law." *Calderon-Cardona v. Bank of N.Y. Mellon*, 770 F.3d 993,

---

[13] Clearstream argues that the applicable state law to determine ownership of the Assets is that of Luxembourg, but the Plaintiffs do not concede this point. Because we remand to the district court to assess the ownership interests under state law, we decline to reach the question of which state's law governs ownership of the Assets.

1001 (2d Cir. 2014). This narrower reading of the notwithstanding clause is also consistent with the statute's internal rules of construction, which state that "[n]othing in this section shall be construed . . . to preempt State law . . . except as expressly provided in subsection (a)(1)." 22 U.S.C. § 8772(c). Subsection (a)(1) preempts only "*inconsistent* provision[s] of State law," *id*. at §8772(a)(1) (emphasis added), supporting our conclusion that Section 8772 does not preempt portions of state law that are not in direct conflict with the text of Section 8772.

Rather than defining "equitable title" or "beneficial interest," Section 8772 only attaches consequences to Iran's holding one of these interests in the assets targeted by the statute—abrogating the execution immunity of the assets and making them available for turnover, attachment, and execution. Under this type of statutory structure, which "creates no property rights but merely attaches consequences, federally defined, to rights created under state law," federal courts "look initially to state law to determine what rights [a party] has in the property." *Export-Import Bank of U.S. v. Asia Pulp & Paper Co.*, 609 F.3d 111, 117 (2d Cir. 2010) (quoting *United States v. Craft*, 535 U.S. 274, 278 (2002)).[14] A two-

---

[14] The district court also declined to analyze these elements because "UBAE itself has admitted that Markazi is the beneficial owner of these assets, and UBAE has claimed no rights to the right to payment in this action." SPA at 54 (citation omitted). However, UBAE's position does not relieve the court of its obligation to make these determinations under Section 8772 when

step analysis is therefore required to "determine whether Iran holds equitable title to, or the beneficial interest in" the Assets. 22 U.S.C. § 8772(a)(2); *see also Asia Pulp & Paper*, 609 F.3d at 117 (looking "to federal law to determine whether the judgment debtor's state-delineated rights . . . trigger application of the FDCPA" only after applying "state law to determine what rights the judgment debtor has in the property the Government seeks to reach" (internal quotation marks and citations omitted)). Here, then, state law must initially be applied to assess the extent of the interests held by Bank Markazi and UBAE in the Assets. Only after those interests are identified under state law does U.S. federal law apply to determine what consequences those interests give rise to under Section 8772.

---

Clearstream continues to dispute these points. *See* 22 U.S.C. § 8772(a)(2) ("[P]rior to an award turning over any asset pursuant to execution or attachment in aid of execution with respect to any judgments against Iran described in paragraph (1), *the court shall determine* whether Iran holds equitable title to, or the beneficial interest in, the assets described in subsection (b) and that no other person possesses a constitutionally protected interest in the assets described in subsection (b) under the Fifth Amendment to the Constitution of the United States." (emphasis added)).

Similarly, we do not agree that the district court's decision in *Peterson I* provides guidance on the ownership interests involved in this case. While the district court relied on the *Peterson I* decision for the proposition that Bank Markazi "was the sole beneficial owner of financial assets in the UBAE/Markazi Account," SPA at 54, *Peterson I* addressed a different set of assets located in an account at a different bank in a different country than the assets at issue in this case. In *Peterson I*, Bank Markazi conceded and Clearstream stipulated for limited purposes that Bank Markazi was the sole beneficial owner of the assets at issue. *Peterson I*, 2013 WL 1155576, at *23. *Peterson I*'s discussion of ownership therefore has no relevance to the ownership of the assets at issue here.

Because the district court treated Section 8772 as preempting Luxembourg law completely, we vacate the district court's grant of summary judgment in favor of the Plaintiffs. On remand, the district court must apply state law to determine the extent of the parties' interests in the Assets, then apply Section 8772 to determine whether turnover is permitted in light of those interests.

**CONCLUSION**

To summarize, we hold that:

(1) The district court lacks subject matter jurisdiction over the Plaintiffs' turnover claim against Bank Markazi. On remand, the district court must determine in the first instance whether Bank Markazi is an indispensable party under Federal Rule of Civil Procedure 19 such that the litigation cannot proceed in its absence.[15]

(2) The district court can exercise personal jurisdiction over Clearstream.

(3) Clearstream's challenge to the constitutionality of Section 8772 fails.

(4) The district court erred in granting summary judgment in favor of the Plaintiffs. On remand, the district court must apply state law to determine the

---

[15] That Judges Sack and Parker do not in this opinion join in the views of Judge Lohier as expressed in his concurring opinion set forth below should not be understood to reflect any view on the part of either Judge Sack or Judge Parker as to the proper application of Rule 19 to the facts of this case. That is for the District Court to do in the first instance.

extent of the parties' interests in the Assets, then apply Section 8772 to determine whether turnover is permitted in light of those interests.

We have considered the parties' remaining arguments on appeal and conclude that they are without merit. For the reasons explained above, we AFFIRM in part and VACATE in part the district court's order and judgment, and REMAND for further proceedings consistent with this opinion.

"[I]f this matter or any part thereof returns to this Court, in light of the history of this litigation . . . and this panel's long-standing familiarity with the matter and the very complex issues to which it gives rise, we respectfully direct the Clerk of this Court to return the matter to this panel for further review and adjudication." *Peterson v. Islamic Republic of Iran*, 963 F.3d 192, 196 (2d Cir. 2020) (per curiam); *see U.S. v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994).

LOHIER, *Circuit Judge*, concurring:

I concur but write separately and briefly to address two issues.

## I

In remanding this matter, our Court today wisely avoids relying on a rule that Congress must speak clearly when it intends to strip a foreign sovereign of jurisdictional immunity from suit (as opposed to immunity from attachment and execution of property). Congress's intent to facilitate turnover of the assets at issue in this case (the "Assets") is crystal clear. *See* 22 U.S.C. § 8772(a)(1). But the majority opinion recognizes that Bank Markazi's immunity from suit on this record comports with congressional intent as expressed in section 8772 and its "notwithstanding" clause precisely because recognizing immunity here still permits turnover of the Assets.

## II

The District Court will have to determine in the first instance whether Bank Markazi is a required party under Rule 19(a) of the Federal Rules of Civil Procedure and, if so, whether Rule 19(b) compels dismissal of this litigation for nonjoinder of Bank Markazi as a party. Fed. R. Civ. P. 19(a), (b). Understanding that the task is for the District Court, not for us, it's hard to see how an outright

1

dismissal follows where, as here, dismissal would frustrate, if not conflict with, Congress's specific purpose in passing section 8772.

In any event, Rule 19 doesn't compel dismissal of this litigation. The application of Rule 19(b) is, after all, a "case-specific inquiry," *Republic of Philippines v. Pimentel*, 553 U.S. 851, 864 (2008), that "can only be determined in the context of particular litigation," *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118 (1968). In determining whether "in equity and good conscience" this action should proceed among the existing parties (without Bank Markazi as a required party) or should be dismissed, we ask four questions: To what extent would a judgment rendered in the absence of the required party prejudice that party or existing parties? Are there protective provisions or measures in the judgment or other forms of relief available to avoid or reduce any prejudice to the parties? Is the proposed relief rendered in the absence of the required party adequate? And is there another remedy available to the plaintiffs if the action is dismissed for nonjoinder? Fed. R. Civ. P. 19(b).

Consider the core issue of prejudice. The Rule 19(b)(1) prejudice inquiry in this case pivots entirely on Bank Markazi's sovereign immunity. In support of dismissal because of the prejudice it would suffer if judgment were rendered in

2

its absence, Bank Markazi points to the Supreme Court's decision in *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008). In *Pimentel*, members of a class of and for human rights victims of Ferdinand Marcos while he was President of the Philippines sought to enforce a district court judgment by attaching the assets of a company, Arelma, incorporated by Marcos. The Arelma assets were held by Merrill Lynch. A Philippine Commission established to recover property wrongfully taken by the Marcos regime also claimed an interest in Arelma's assets, as did the Republic of the Philippines itself. Facing competing claims, Merrill Lynch filed an interpleader action, naming the class, the Republic, and the Philippine Commission as defendants. The Supreme Court held that the Republic and the Commission enjoyed foreign sovereign immunity and were required parties under Rule 19(a), and that the litigation must be dismissed pursuant to Rule 19(b). *Pimentel*, 553 U.S. at 864.

*Pimentel* establishes the following general rule with respect to when and whether prejudice to an absent sovereign requires dismissal of a case under Rule 19(b)(1): "A case may not proceed when a required-entity sovereign is not amenable to suit. . . . [W]here sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where

3

there is a potential for injury to the interests of the absent sovereign." *Id.* at 867.

Bank Markazi argues that this rule is dispositive. Equity and good conscience, it says, require that this action be dismissed for nonjoinder given the prejudice it faces as a required party and a foreign sovereign entitled to immunity. I have my doubts.

To start, Bank Markazi's argument seems to overlook that "the determination whether to proceed will turn upon factors that are case specific," reflecting the fact that Rule 19 is "based on equitable considerations," not strict rules. *Id.* at 862–63. Here, moreover, several factors distinguish Bank Markazi's case from *Pimentel*. But let me focus on an especially important difference. The Court in *Pimentel* highlighted considerations of international comity. *Id.* at 866. Whether or not comity is even implicated in light of Section 8772's command that its provisions apply "without regard to concerns relating to international comity," 22 U.S.C. § 8772(a)(1), the specific considerations of comity raised in *Pimentel* certainly do not apply here. In *Pimentel*, the Court explained that international comity strongly favors allowing a sovereign to litigate in its *own courts*. *Pimentel*, 553 U.S. at 866. That is not possible here, since the choice is between litigating in the United States or Luxembourg, not Iran.

4

Second, *Pimentel* instructs us to consider whether the judgment would be rendered meaningless if the sovereign were absent and not bound by it. *Id.* at 870–71; *see also Seneca Nation of Indians v. New York*, 383 F.3d 45, 48 (2d Cir. 2004) (judgment against absent sovereign would be "meaningless"). Whether an absent party will be bound by a judgment bears on "whether a judgment rendered in the person's absence would be adequate." Fed. R. Civ. P. 19(b)(3). *Pimentel* explains that "adequacy refers to the public stake in settling disputes by wholes, wherever possible." *Pimentel*, 553 U.S. at 870 (quotation marks omitted). Here, exercising jurisdiction over Bank Markazi is not necessary to order turnover of the Assets, so Bank Markazi's participation in the litigation does not appear to be required for that purpose.

Third, the equities favored dismissal in *Pimentel* in part because the party seeking to enforce its judgment against the foreign sovereign—the class that held a judgment against Marcos—was not the plaintiff in the proceedings. The plaintiff was Merrill Lynch, the broker that held the sought-after assets and filed an interpleader action to resolve claims against it. Though the Supreme Court acknowledged some prejudice to Merrill Lynch from dismissing the litigation, that prejudice did not outweigh the prejudice to the Philippines based on its

5

sovereign status.  *See id.* at 871–72.  But the equities seem to differ where, as here, the plaintiffs in the case are the judgment holders themselves.

There are other reasons it is not clear to me that *Pimentel* requires dismissing this litigation for nonjoinder of Bank Markazi under Rule 19.  The adequacy of any judgment in this case would appear to be unaffected by the Bank's absence as a bound party.  On the other hand, dismissing this litigation for nonjoinder might lead to the arguably inequitable result of ending the plaintiffs' painstaking and decades-long efforts to enforce their judgment as Congress appears to have wanted.